134 F.3d 260
 S.P., a Citizen of Takoma Park, Maryland, Plaintiff-Appellant,
v.
The CITY OF TAKOMA PARK, MARYLAND; Robert Phillips, in his
official capacity as Chief of the Takoma Park Police
Department; Brian Rich, individually and in his capacity as
an officer of the Takoma Park Police Department; Unknown
and Unidentified Police Officers of the Takoma Police
Department who were present at and involved in the incidents
complained of herein, individually and in their capacity as
officers of the Takoma Park Police Department; Washington
Adventist Hospital; Cyril Hardy; James Buxbaum; Paul
O'Brien; Carla Cunningham; Marlene Wesley, Defendants-Appellees.
American Civil Liberties Union of Maryland, Inc., Amicus Curiae,
Zuckert, Scoutt & Rasenberger, L.L.P., Movant.
 No. 97-1218.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 1, 1997.
Decided Jan. 15, 1998.
 
 ARGUED: Mark McLaughlin Hager, Professor of Law, Washington College of Law, American University, Washington, DC, for Appellant. Daniel Karp, Allen, Johnson, Alexander & Karp, Baltimore, MD; Alan Douglas Titus, Carr, Goodson, Lee & Warner, P.C., Washington, DC; Andrew Edward Vernick, Wharton, Levin, Ehrmantraut, Klein & Nash, Annapolis, MD, for Appellees. ON BRIEF: Michelle L. Bower, Allen, Johnson, Alexander & Karp, Baltimore, MD, for Appellees. Dwight H. Sullivan, American Civil Liberties Union Of Maryland, Baltimore, MD; David B. Isbell, Mark H. Lynch, Nancy Dickinson, Covington & Burling, Washington, DC, for Amicus Curiae.
 Before HAMILTON and WILLIAMS, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 Affirmed by published opinion. Judge WILLIAMS wrote the opinion, in which Judge HAMILTON and Senior Judge BUTZNER joined.
 OPINION
 WILLIAMS, Circuit Judge:
 
 
 1
 In this appeal, we address the Fourth Amendment concerns attendant to the involuntary seizure and transportation of an individual by police officers to a private medical facility for an emergency psychiatric evaluation. Susan Peller, claiming that her civil rights were violated when she was involuntarily detained for an emergency evaluation, brought suit under 42 U.S.C.A. # 8E8E # 1983 (West Supp.1997) & 1985 (West 1994), against several City of Takoma Park police officers, including Police Chief Robert Phillips and Officer Brian Rich; the Washington Adventist Hospital (WAH) and several of its personnel; and the City of Takoma Park.
 
 
 2
 Pursuant to defendants' motions for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the district court granted Officer Rich and the other unnamed Takoma Park officers qualified immunity on the ground that Peller failed to allege facts establishing a violation of clearly established law. Additionally, the court dismissed the claims against WAH and its personnel, concluding that they were not acting under color of state law when they treated Peller.[1] The district court denied Takoma Park's motion to dismiss. After discovery by both parties, however, the court subsequently granted Takoma Park's summary judgment motion on the ground that there was no causal link between the city's involuntary commitment policy and Peller's injuries. For reasons discussed fully below, we affirm.
 
 I.
 
 3
 The following facts, unless otherwise noted, are based upon the allegations in Peller's complaint. See Jenkins v. Medford, 119 F.3d 1156, 1159 (4th Cir.1997) (en banc) (noting that for purposes of reviewing a dismissal under Rule 12(b)(6) of Federal Rules Civil Procedure we must assume that the facts as stated in the complaint are true), cert. denied, --- U.S. ----, 118 S.Ct. 881, 139 L.Ed.2d 869 (1997). On the morning of May 6, 1992, Peller and her husband had an argument in their home in Takoma Park, Maryland. As a result of the argument, Mr. Peller left the house at about 9:30 a.m. He went to a coffee shop and telephoned information. He requested a listing for a "mental health hot-line." (J.A. at 7.) After the operator informed him that there was no such listing, Mr. Peller called the police department's business line and asked for a referral to a marriage counselor.
 
 
 4
 The non-emergency police dispatcher to whom Mr. Peller was speaking, for reasons that are not clear from the record, transferred his call to an emergency dispatcher. Mr. Peller reiterated his request for a marriage counselor referral. The emergency dispatcher, after first gathering routine information regarding Peller's address and current location, told Mr. Peller that the only listing she had was for a suicide hot-line. After further conversation with Mr. Peller, the emergency dispatcher sent police officers to the Pellers' home to investigate. Police dispatch records submitted with Takoma Park's motion for summary judgment confirm that the dispatcher informed the officers that the problem at the home was a "possible suicidal person: Susan Peller." (J.A. at 256.)
 
 
 5
 At approximately 9:48 a.m., four uniformed officers, including Officer Rich, arrived at the Peller home. When the officers arrived, Mrs. Peller was visibly agitated and crying. She stated that she and her husband had had a "painful argument." (J.A. at 10.) After additional conversation between Officer Rich and Mrs. Peller, Sergeant Bonn,[2] Officer Rich's supervisor, entered the room. He decided that the officers should take Peller to the hospital for an emergency psychiatric evaluation. Peller disagreed and resisted leaving her home. As a result, the officers were required to handcuff her before removing her from her home.
 
 
 6
 Upon arrival at WAH with Peller, Officer Rich prepared a petition seeking an emergency psychiatric evaluation under Maryland law. See Md.Code Ann., Health-Gen. I. § 10-622(a) (1994). His petition reported:
 
 
 7
 I responded to Ms. Peller's home for a check on welfare. Ms. Peller's husband called the police to report that she may commit suicide. Upon our arrival Ms. Peller [were] very upset and distraught. She told us [that] if it was not for her kids she would end her life. She told me [that] she would disappear by the end of the day. She appeared very upset and irrational. We then felt she was in danger of hurting herself and took her to WAH for mental evaluation.
 
 
 8
 (J.A. at 270.) Upon receipt of Officer Rich's properly executed petition, two WAH emergency room physicians, Dr. O'Brien and Dr. Buxbaum, examined Peller to determine whether she met the statutory criteria for involuntary admission. See Md.Code Ann., Health-Gen. I § 10-624(b) (1994). After their examination, the doctors concluded that Peller had a mental disorder, needed inpatient care, presented a danger to herself, was unable or unwilling to be voluntarily committed, and there was no less restrictive intervention available. These findings met the requirements of Maryland law for involuntary admission. See Md.Code Ann., Health-Gen. I § 10-617 (1994).
 
 
 9
 Shortly after the completion of the examination, Peller telephoned her husband. He subsequently contacted WAH to report that his wife's detention was the result of a grave error and miscommunication with the police department. Because the doctors had diagnosed Peller as "depression/suicidal," (J.A. at 272-73), and had determined that she met the qualifications for involuntary detention under Maryland law, the WAH staff refused to release Peller into her husband's custody. Instead, the WAH personnel, following statutory procedures, involuntarily admitted Peller to WAH that afternoon, several hours after the police had removed her from her home.
 
 
 10
 The next evening, May 7, WAH's attending psychiatrist, Dr. Cyril Hardy, gave Peller a complete psychiatric examination and determined that she was neither suicidal nor suffering from a mental disorder at that time. As a result of Dr. Hardy's new diagnosis, Peller was released from WAH on the morning of May 8, 1992.
 
 II.
 
 11
 Peller has narrowed her issues on appeal to three claims. First, she claims that the police officers violated clearly established law when they seized and transported her to WAH without probable cause and, therefore, are not entitled to qualified immunity. Second, she argues that WAH, Nurse Wesley, and Dr. Hardy were acting under color of state law when they caused her to be involuntarily committed and, therefore, are subject to liability under 42 U.S.C.A. § 1983. Finally, Peller contends that Takoma Park's emergency psychiatric detention policy, as interpreted and applied within its police department, unconstitutionally deprived her of her Fourth Amendment right to be free from unreasonable seizure. We will address each of Peller's claims in turn.
 
 A.
 
 12
 Peller first argues that the district court erroneously dismissed her claims against the police officers in their individual capacities. She contends that she stated a claim upon which relief could be granted by alleging that the police violated clearly established law when they involuntarily detained her without probable cause. After a de novo review, see Jenkins v. Medford, 119 F.3d 1156, 1159 (4th Cir.1997) (en banc), we conclude that Peller failed to allege facts demonstrating the violation of clearly established law; therefore, the officers are entitled to qualified immunity. See Behrens v. Pelletier, 516 U.S. 299, 306-08, 116 S.Ct. 834, 839, 133 L.Ed.2d 773 (1996) (holding that a defendant pleading qualified immunity on a motion to dismiss is entitled to prevail if the allegations in the complaint fail to state a claim of violation of clearly established law); Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) ("Unless [a] plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."); Jenkins, 119 F.3d at 1160 (holding that when the complaint fails to show that the plaintiff has suffered a deprivation of a constitutional right, a defendant pleading qualified immunity is entitled to dismissal of the claim under Rule 12(b)(6)).
 
 
 13
 It is a well settled proposition that government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). When determining whether law enforcement officers are entitled to qualified immunity, we must (1) identify the right allegedly violated, (2) determine whether the constitutional right violated was clearly established at the time of the incident, and (3) evaluate whether a reasonable officer would have understood that the conduct at issue violated the clearly established right. See Smith v. Reddy, 101 F.3d 351, 355 (4th Cir.1996). "If the right was not clearly established at the relevant time or if a reasonable officer might not have known that his or her conduct violated that right, the officer is entitled to immunity." Id. The question before us is whether Peller has alleged the violation of a clearly established constitutional right. Peller asserts that the clearly established right that the officers violated was her Fourth Amendment right to be free from seizure for the purpose of medical treatment absent probable cause to believe that she suffered from a mental disorder, posed a danger of serious harm to herself, and that there was no less restrictive alternative available consistent with her welfare.[3] Because we conclude that the contours of such a right were not clearly established so as to make the unlawfulness of these officers' actions apparent, we affirm the district court's order granting the officers qualified immunity and dismissing her claim.
 
 1.
 
 14
 "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 635, 107 S.Ct. 3034, 3036, 97 L.Ed.2d 523 (1987) (quoting Harlow, 457 U.S. at 819, 102 S.Ct. at 2738). In 1992 we recognized that "the general right to be free from seizure unless probable cause exists was clearly established in the mental health seizure context." See Gooden v. Howard County, 954 F.2d 960, 968 (4th Cir.1992) (en banc) (emphasis added). Moreover, it was arguably clearly established that an officer must have probable cause to believe that the individual posed a danger to herself or others before involuntarily detaining the individual. See id. We have held, however, that " 'if the test of "clearly established law" were to be applied at this level of generality, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability.' " Id. (quoting Anderson, 483 U.S. at 639, 107 S.Ct. at 3039) (alterations in original omitted).
 
 
 15
 Thus, to defeat a qualified immunity defense, Peller must show that the right allegedly violated was "clearly established" in more than just a general sense. She must demonstrate that the particular actions of these police officers were unlawful under the law established at the time of the incident. See Anderson, 483 U.S. at 640, 107 S.Ct. at 3039; see also Cullinan v. Abramson, 128 F.3d 301, 310 (6th Cir.1997) (holding that "[i]t is not determinative ... that the plaintiff has asserted the violation of a broadly stated general right" (citation omitted)). To be clearly established for purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640, 107 S.Ct. at 3039. "[T]he basic purpose of qualified immunity ... is to spare individual officials the burdens and uncertainties of standing trial in those instances where their conduct would strike an objective observer as falling within the range of reasonable judgment." Gooden, 954 F.2d at 965. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir.1992). In other words, to establish liability, Peller had to allege facts demonstrating that the established contours of probable cause were sufficiently clear at the time of the seizure such that the unlawfulness of the officers' actions would have been apparent to reasonable officers.
 
 
 16
 Noting the meticulousness with which courts have defined probable cause in the criminal context, in Gooden we lamented "[t]he lack of clarity in the law governing seizures for psychological evaluations," 954 F.2d at 968, and concluded that "the law was not clear," id.; see also id. ("We are aware of no cases that define 'dangerousness' with the requisite particularity or explain what type of evidence would be constitutionally sufficient to establish probable cause of a dangerous condition."); id. at 967 (noting that it is "all too facile [to suggest] that the officers should have walked away from the situation because [the plaintiff] evidenced no injuries at the time they were with her [because if] the officers had refused to act until they saw blood, bruises, and splintered furniture, it might have been too late" (internal quotation marks omitted) (first alteration in original)). Accordingly, we conclude that there was no clearly established authority which would have put these officers on notice that their conduct violated Peller's Fourth Amendment rights.
 
 2.
 
 17
 We decided Gooden v. Howard County, the only case in this Circuit addressing the constitutionality of police officers seizing an individual they believed to be mentally ill, four months prior to the events giving rise to this appeal. In Gooden, police officers in Baltimore, Maryland, responded to a call from a resident of an apartment complex complaining that screams were emanating from the apartment located above her. Id. The officers questioned Ms. Gooden, the occupant of the upstairs apartment. Ms. Gooden explained that she had been asleep and had no knowledge of the noise. Id. Observing no signs of physical abuse, the officers departed. Approximately a week and a half later, the officers were again called to investigate the screams. Upon hearing what one officer described as a "long, loud blood-chilling scream," the officers again questioned Ms. Gooden. Id. The officers reported that she was vague and evasive in her responses to their inquiries. As a result of Ms. Gooden's perceived demeanor and the neighbor's complaints, the officers decided to involuntarily detain Ms. Gooden for an emergency mental evaluation pursuant to the same Maryland procedures relied upon in this appeal. The officers admitted that there was no evidence to suggest that Ms. Gooden had injured herself or anyone else and that she had denied making the screams. Id. The examining physician found no sign of mental illness and released Ms. Gooden. Id. at 964. Ms. Gooden, like Peller, subsequently brought suit against the officers in their individual capacities, alleging that they had violated her Fourth Amendment rights when they seized her without probable cause. On appeal, we reversed the district court and held that the officers were entitled to qualified immunity. See id. at 968-69. In doing so, we concluded that "the law was not clear and thus failed to put these officers on notice that their conduct was unlawful." Id. at 968.
 
 
 18
 These officers responded to an emergency police dispatch alerting them that Peller's husband had telephoned the police department seeking help. When they arrived, the officers were confronted with an obviously distraught and crying individual alone in her home. Peller initially refused to speak with the officers but she finally relented and allowed them into her home. Although she denied having any suicidal thoughts, being depressed, or being under the care of a physician, she was uncooperative, hostile, very upset, and irrational. During Officer Rich's questioning, Peller admitted that she had had a "painful" argument with her husband and that if not for her children, she would have considered committing suicide. The police officers did not decide to detain Peller in haste. Rather, they had ample opportunity to observe and interview Peller before making a deliberate decision. Moreover, they were acting pursuant to Maryland law which authorized them to involuntarily detain and transport an individual to a facility for an emergency mental evaluation if they had "reason to believe that the individual has a mental disorder and that there is clear and imminent danger of the individual's doing bodily harm to the individual or another." Md.Code Ann., Health-Gen. I § 10-622(a) (1994).
 
 
 19
 Reasonable officers, relying upon our decision in Gooden and the other circuit court decisions addressing similar situations, would have concluded that involuntarily detaining Peller was not only reasonable, but prudent.[4] See Gooden, 954 F.2d at 969 (holding "that the officers' conduct ... satisfie[d] the test of objective reasonableness laid down by the Supreme Court"). As in Gooden, these officers were responding to an emergency call from a concerned third-party alerting them of a potentially dangerous situation. See also Maag v. Wessler, 960 F.2d 773, 775 (9th Cir.1992) (finding officers' detention of individual reasonable when accomplished, in part, based upon concerned family members' requests for help); Chathas v. Smith, 884 F.2d 980, 987 (7th Cir.1989) (finding officers' detention of individual reasonable when effectuated based upon information provided by doctor, rather than their own personal observations). Also, as in Gooden, even though the individual exhibited no signs of physical abuse and denied any psychiatric problems, the officers perceived Peller to be evasive and uncooperative. Finally, the officers were acting in reliance upon the same Maryland involuntary commitment statute we cited with approval in Gooden. Cf. Maag, 944 F.2d at 657 (granting officers qualified immunity based, in part, upon their adherence to the Montana involuntary commitment statute). Based upon the foregoing, we conclude that there was no clearly established authority available which would have notified these officers that their conduct was unlawful. As a result, they are entitled to qualified immunity.[5]
 
 B.
 
 20
 Second, Peller contends that the district court erroneously dismissed her federal claims under 42 U.S.C.A. § 1983 (West Supp.1997), against WAH, Nurse Marlene Wesley, and Dr. Hardy, because Maryland's involuntary commitment statute required them to conduct the evaluation that led to her involuntary commitment. As a result, Peller contends that WAH and its personnel were state actors.[6] We conclude, however, that the statutory scheme, when viewed as a whole, is more permissive than mandatory, and that it grants private physicians complete medical discretion in determining whether an individual should be involuntarily committed. Accordingly, we decline to hold the private individuals to be state actors and dismiss Peller's § 1983 claims against them.
 
 Section 1983 of Title 42 provides that
 
 21
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.
 
 
 22
 42 U.S.C.A. § 1983 (West Supp.1997). Under the express terms of the statute, § 1983 applies only to those persons who act "under color" of law. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 2753-54, 73 L.Ed.2d 482 (1982) (holding that a § 1983 claim requires a showing that "the conduct allegedly causing the deprivation of [the plaintiff's rights] be fairly attributable to the State"). WAH, Nurse Wesley, and Dr. Hardy are all private entities or individuals, not state employees.
 
 
 23
 This Court has identified three situations, however, in which a private party's conduct may constitute "state action." A private entity regulated by the state acts under color of state law (1) when there is either a sufficiently close nexus, or joint action between the state and the private party; (2) when the state has, through extensive regulation, exercised coercive power over, or provided significant encouragement to, the private actor; or (3) when the function performed by the private party has traditionally been an exclusive public function. See Conner v. Donnelly, 42 F.3d 220, 223-24 (4th Cir.1994) (citing Blum v. Yaretsky, 457 U.S. 991, 1004-05, 102 S.Ct. 2777, 2785-86, 73 L.Ed.2d 534 (1982)). The district court found that none of these tests had been satisfied. On appeal, Peller focuses upon the second test, i.e., state compulsion, to prove that WAH and its personnel were acting under color of state law when they involuntarily detained Peller.[7] Peller cites five statutory provisions as evidence that Maryland's involuntary commitment statute coerces private medical parties, upon presentation of a properly executed petition, to conduct an emergency evaluation, and if the state-prescribed criteria are met, to admit involuntarily the evaluee. First, Maryland law provides that "[i]f the petition is executed properly, the emergency facility shall accept the emergency evaluee," Md.Code Ann., Health-Gen. I § 10-624(b)(1) (1994), and that "[i]f an emergency evaluee meets the requirements for an involuntary admission and is unable or unwilling to agree to a voluntary admissions under this subtitle, the examining physician shall take the steps needed for involuntary admission," Md.Code Ann., Health-Gen. I § 10-625(a) (1994). One of the requirements for involuntary admission is that a physician conclude that the evaluee has a "mental disorder," a term defined in the statute. Peller argues that the statutory definition of "mental disorder", i.e., one that is described in the current version of the American Psychiatric Association's Diagnostic and Statistical Manual--Mental Disorders, replaces the physician's discretion with state-prescribed criteria. See Md.Code Ann., Health-Gen. I § 10-620(e)(ii) (1994). Peller also points to the statutory provisions providing for reimbursement for services provided under an emergency petition if the emergency evaluee is unable to pay, see Md.Code Ann., Health-Gen. I § 10-628 (1994), and exempting police officers from liability under state law, see Md.Code Ann., Health-Gen. I § 10-629 (1994), to show that WAH and its staff were compelled to act.
 
 
 24
 This Circuit has never addressed under what circumstances, if any, a private medical professional acting pursuant to a state involuntary commitment statute is acting under color of state law. We, like the Seventh Circuit, however, find it difficult to believe that "the relevant provisions of the Mental Health Code were enacted ... to encourage commitments, any more than state repossession laws are passed because states want to encourage creditors to repossess their debtors' goods." Spencer v. Lee, 864 F.2d 1376, 1379 (7th Cir.1989) (en banc); see also Pino v. Higgs, 75 F.3d 1461, 1467 (10th Cir.1996) (concluding that independent physicians were not state actors in the context of mental civil commitments); Harvey v. Harvey, 949 F.2d 1127, 1131 (11th Cir.1992) (same); Janicsko v. Pellman, 774 F.Supp. 331 (M.D.Pa.1991) (same), aff'd, 970 F.2d 899 (3d Cir.1992). The provisions of the Maryland statute cited by Peller use language which arguably suggests a degree of coercion. A review of Maryland's entire involuntary commitment statutory scheme, however, convinces us that it is permissive and leaves a great deal of discretion to the private medical provider.
 
 
 25
 Section 10-622(a), the initial step of the involuntary commitment process, provides that:
 
 
 26
 A petition for emergency evaluation of an individual may be made under this section only if the petitioner has reason to believe that the individual has a mental disorder and that there is clear and imminent danger of the individual's doing bodily harm to the individual or another.
 
 
 27
 Md.Code Ann., Health-Gen. I § 10-622(a) (1994) (emphasis added). Contrary to Peller's assertions, this section does not mandate the initiation of involuntary commitment proceedings whenever the state-prescribed criteria are met. Rather, it states that such proceedings cannot be initiated absent the existence of the criteria. Moreover, under § 10-617(a), a hospital is prohibited from involuntarily admitting an individual absent an examining physician's finding that the individual meets certain criteria. See Md.Code Ann., Health-Gen. I § 10-617(a) (1994). The converse, that a hospital must admit an individual who meets the criteria, is not true.[8] Also, while "mental disorder" is statutorily defined, it is defined broadly with reference to a generally accepted psychiatric diagnostic guidebook. Moreover, it is but one of five criteria that must be satisfied before an evaluee is eligible for involuntary admission. The evaluation of the remaining four criteria is left to the complete discretion of the examining physician. See Md.Code Ann., Health-Gen. I § 10-617(a).
 
 
 28
 In sum, the statutory scheme, while providing guidelines to mental health care providers, does not coerce, or even encourage, physicians to involuntarily commit individuals. Cf. Janicsko, 774 F.Supp. at 338-39 (construing a nearly identical statute as permissive rather than mandatory). As the Supreme Court held in Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), a state is not liable for determinations that "ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State." Id. at 1008, 102 S.Ct. at 2780. Accordingly, we dismiss Peller's federal claims against WAH and its staff, including Dr. Hardy.
 
 C.
 
 29
 Peller claims that the City of Takoma Park should be held liable for her alleged injuries because she sustained them as a direct result of Takoma Park's policy that allowed the police officers to detain her based simply upon their "reason to believe" that she met the statutory requirements for involuntary detention, a threshold she and Amicus interpret to be much lower than the "probable cause" standard required by the Constitution.[9][9] Indeed, Peller correctly recites the law of this Circuit when she states that, in the context of mental health seizures, officers must have probable cause. See Gooden, 954 F.2d at 967. In light of the additional undisputed facts before the district court at summary judgment, however, we conclude that the police officers had the requisite probable cause to detain Peller. Thus, even if Takoma Park's policy were unconstitutional, the policy did not cause Peller's injuries and, therefore, she cannot recover from Takoma Park. Accordingly, we affirm the grant of summary judgment to Takoma Park.
 
 1.
 
 30
 Before we begin our analysis of Peller's challenge to the constitutionality of Takoma Park's involuntary detention policy, it is important to note that Peller does not assert a facial challenge to the policy.[10] This is not surprising in light of the numerous court decisions upholding the constitutionality of this specific statute and other similarly phrased statutes allowing police officers to involuntary detain individuals if they have "reason to believe" or a "reasonable belief" that the individual is mentally ill and poses a danger to herself or others. See Gooden, 954 F.2d 960 (finding police officers' detention of individual for mental evaluation pursuant to Maryland statute objectively reasonable and therefore, not violative of the Fourth Amendment); Ahern v. O'Donnell, 109 F.3d 809, 817 (1st Cir.1997) (interpreting Massachusetts statute authorizing a police officer who "believes that failure to hospitalize a person would create a likelihood of serious harm by reason of mental illness" to detain such person as requiring probable cause, and therefore, constitutional); Monday v. Oullette, 118 F.3d 1099, 1103 (6th Cir.1997) (concluding that police officer's compliance with Michigan statute authorizing officer who "reasonably believe[s]" that an individual requires psychiatric treatment satisfied the probable cause requirement of the Fourth Amendment); Pino v. Higgs, 75 F.3d 1461, 1468-69 (10th Cir.1996) (dismissing plaintiff's Fourth Amendment claim because police officers detained her in accordance with New Mexico statute authorizing police officers to detain individual once they had "reasonable grounds to believe that the person, as a result of mental illness, present[ed] a serious likelihood of harm to [her]self or others"); Sherman v. Four County Counseling Center, 987 F.2d 397, 410 (7th Cir.1993) (finding that Indiana statute authorizing police officers to detain individuals if they have "reasonable grounds to believe that an individual is mentally ill, dangerous, and in immediate need of hospitalization and treatment" was facially valid). Rather, Peller seeks to establish that Takoma Park's policy, while facially valid, is unconstitutionally applied by its police department as evidenced by the department's inadequate training of its officers.
 
 
 31
 A municipality may be held liable under 42 U.S.C.A. § 1983 for constitutional violations resulting from its failure to train municipal employees. See Canton v. Harris, 489 U.S. 378, 380, 109 S.Ct. 1197, 1200, 103 L.Ed.2d 412 (1989). Viewing the evidence in the light most favorable to Peller, we assume that Takoma Park failed to instruct its police officers that its policy allowing the seizure of an individual based upon the officers' "reason to believe" is not a lesser standard of evidence, but is consistent with the Fourth Amendment's requirement that they have probable cause to lawfully detain an individual for an emergency psychiatric evaluation.[11] The omission of instruction regarding the proper constitutional standard to detain an individual in the mental health context is clearly inadequate training. See Gooden, 954 F.2d at 967 (holding that a police officer's seizure of an individual for an emergency psychiatric evaluation must be supported by probable cause); see also Monday, 118 F.3d at 1101; Ahern, 109 F.3d at 817; Pino, 75 F.3d at 1467-68; Sherman, 987 F.2d at 401; Glass v. Mayas, 984 F.2d 55, 58 (2nd Cir.1993); Maag v. Wessler, 960 F.2d 773, 775-76 (9th Cir.1991); In re Barnard, 455 F.2d 1370, 1373-74 (D.C.Cir.1971). Even assuming for the purposes of summary judgment that the training of its officers was unconstitutional, Takoma Park cannot be held liable when, as here, no constitutional violation occurred because the officers had probable cause to detain Peller. See Board of County Commissioners v. Brown, --- U.S. ----, ----, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997) (holding that a plaintiff must show a "direct causal link between the municipal action and the deprivation of federal rights" before a municipality may be held liable under 42 U.S.C.A. § 1983); City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) (holding that a municipality may be held liable under 42 U.S.C.A. § 1983 only for an actual constitutional violation committed by individual official).
 
 2.
 
 32
 In Gooden, we concluded that the law governing what constitutes probable cause in the mental health context was unclear in comparison with the abundance of guidance found in the criminal context. 954 F.2d at 968. Moreover, we acknowledged that reasonableness under the Fourth Amendment is a fact-specific determination that must be made on a case-by-case basis. See id. As the Supreme Court has held:
 
 
 33
 Articulating precisely what "reasonable suspicion" and "probable cause" mean is not possible. They are common-sense, non-technical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act. As such, the standards are not readily, or even usefully, reduced to a neat set of legal rules.... We have cautioned that these two legal principles are not finely-tuned standards, comparable to the standards of proof beyond a reasonable doubt or of proof by a preponderance of the evidence. They are instead fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed.
 
 
 34
 Ornelas v. United States, 517 U.S. 690, ----, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911 (1996) (citations and internal quotation marks omitted) (emphasis added).
 
 
 35
 When, as in this case, there is no genuine issue of material fact, the existence of probable cause becomes a purely legal question subject to de novo review. See Potts v. City of Lafayette, 121 F.3d 1106, 1112 (7th Cir.1997) (holding that "[i]f the underlying facts supporting the probable cause determination are not in dispute, the court can decide whether probable cause exists"). In the context of a criminal arrest, we have held that when
 
 
 36
 assessing the existence of probable cause, courts examine the totality of the circumstances known to the officer at the time of the arrest. Probable cause exists when the facts and circumstances known to the officer would warrant the belief of a prudent person that the arrestee had committed or was committing an offense. Probable cause must be supported by more than a mere suspicion, but evidence sufficient to convict is not required.
 
 
 37
 Taylor v. Waters, 81 F.3d 429, 434 (4th Cir.1996) (citations and internal quotation marks omitted); see also United States v. Dorlouis, 107 F.3d 248, 255 (4th Cir.1997) (holding that "probable cause ... depends upon whether ... the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the defendant or defendants had committed an offense"), cert. denied, --- U.S. ----, 117 S.Ct. 2525, 138 L.Ed.2d 1025 (1997). While probable cause remains, even in the criminal context, a sometimes difficult and always fact-specific inquiry, there are a plethora of cases refining its boundaries. Unfortunately, the law governing seizures for psychiatric evaluations is not nearly as well-defined. See Gooden, 954 F.2d at 968 ("Certainly the concept of 'dangerousness' which calls on lay police to make a psychological judgment is far more elusive than the question of whether there is probable cause to believe someone has in fact committed a crime."); id. ("The lack of clarity in the law governing seizures for psychological evaluations is striking when compared to the standards detailed in other Fourth Amendment contexts, where probable cause to suspect criminal misconduct has been painstakingly defined."); id. ("We are aware of no cases that define 'dangerousness' with the requisite particularity or explain what type or amount of evidence would be constitutionally sufficient to establish probable cause of a dangerous condition.").
 
 
 38
 "The touchstone of the Fourth Amendment is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991). Reasonableness is measured in objective terms by examining the totality of the circumstances. See Ohio v. Robinette, 519 U.S. 33, ----, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996). In determining the reasonableness of a seizure "it is necessary 'first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen,' for there is 'no ready test for determining reasonableness other than by balancing the need to [seize] against the invasion which the [seizure] entails.' " Terry v. Ohio, 392 U.S. 1, 20-21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968) (quoting Camara v. Municipal Court, 387 U.S. 523, 534-35, 537, 87 S.Ct. 1727, 1734, 1735, 18 L.Ed.2d 930 (1967)); see also Villanova v. Abrams, 972 F.2d 792, 796 (7th Cir.1992) (determining that reasonableness of detainee's commitment turns upon whether the seriousness of the potential harm and the probability of that harm outweigh the cost of confinement to the detainee).
 
 
 39
 Maryland's involuntary commitment procedures, adopted verbatim by Takoma Park, provide that an emergency evaluee transported to a medical facility must be evaluated by a physician within six hours of arrival. See Md.Code Ann., Health-Gen. I § 10-624(b)(2) (1994). The statute further directs the prompt release of the evaluee after the examination unless she is voluntarily admitted to the facility or the physician determines that the evaluee meets the requirements for involuntary admission. See Md.Code Ann., Health-Gen. I § 10-624(b)(3) (1994). Peller's detention and transportation to WAH for the limited purpose of a psychiatric evaluation within six hours by trained medical professionals was a very limited intrusion and objectively reasonable in light of the totality of the circumstances confronting the officers. In addition to the facts outlined in the complaint and previously discussed, supra in Part II.A.2., it is undisputed that the officers were informed by the dispatcher that Peller's husband had reported her to be suicidal. Moreover, Peller made certain disturbing statements to Officer Rich, including "I want to leave this earth," "I don't want to be here," "I will not be around when my children get home," (J.A. at 259), and that she would "disappear by the end of the day," (J.A. at 270).[12] Based upon the foregoing, we hold as a matter of law that the officers had probable cause to believe that there was a clear and imminent danger that Peller, as a result of a mental disorder, would harm herself if left alone. See Gooden, 954 F.2d at 967 (noting that it is "all too facile [to suggest] that the officers should have walked away from the situation because [the plaintiff] evidenced no injuries at the time they were with her [because if] the officers had refused to act until they saw blood, bruises and splintered furniture, it might have been too late" (internal quotation marks omitted) (first alteration in original)); cf. Monday, 118 F.3d at 1102-03 (probable cause supported detention of individual for mental evaluation, despite individual appearing coherent and denying suicidal thoughts, when officer had been summoned by dispatcher to respond to suicide threat, individual was drinking, and a number of prescription pills were missing); Ahern, 109 F.3d at 817-18 (probable cause supported detention of individual for mental evaluation when individual threatened another a day earlier and had a history of harassment, threats, and stalking, despite the lack of visible signs of mental illness or threat of dangerousness at the time of the seizure); Sherman, 987 F.2d at 401-02 (probable cause supported detention of individual for mental evaluation based upon individual's numerous threats against others and odd public behavior); Maag, 960 F.2d at 776 (probable cause supported detention of individual for mental evaluation based upon information from family members and friends that individual was irrational, individual's disoriented appearance, and a physician's advice). Because the officers had probable cause to detain Peller for the limited purpose of transporting her to WAH for an emergency mental evaluation, no constitutional violation occurred. As such, Takoma Park necessarily is not liable for any alleged injuries. Accordingly, we affirm the district court's grant of summary judgment to Takoma Park.
 
 III.
 
 40
 In conclusion, we affirm the district court's dismissal of Peller's federal claims against the individual police officers, holding that their actions did not violate clearly established law and therefore, they are entitled to qualified immunity. We conclude that WAH and its personnel were not acting under color of law when they involuntarily detained and subsequently admitted Peller, and therefore, are not subject to liability under 42 U.S.C.A. § 1983. And finally, we hold that, considering the totality of the circumstances, the officers had probable cause to believe that Peller suffered from a mental disorder and was a clear and imminent danger to herself. Accordingly, Peller's constitutional rights were not violated and therefore, Takoma Park is not liable to Peller.
 
 
 41
 AFFIRMED.
 
 
 
 [1]
 The district court also dismissed the federal claims against Chief Phillips pursuant to Rule 8(a) of the Federal Rules of Civil Procedure, stating that the complaint did not provide him with fair notice of the claims against him and that to sue him in only his official capacity was a mere redundancy because the City of Takoma Park was already named as a defendant. Further, the district court dismissed several state law claims against the municipal defendants, concluding that Peller had failed to comply with Maryland's statutory notice requirements. See Md.Code Ann., Cts. & Jud. Proc. § 5-404(a) (1995). Additionally, the district court declined to exercise jurisdiction over Peller's pendent state law claims against WAH and its personnel and dismissed them without prejudice. The district court also concluded that Peller failed to allege facts sufficient to establish a 42 U.S.C.A. § 1985 conspiracy claim between the police officers and the medical defendants. None of these rulings have been appealed
 
 
 [2]
 Sergeant Bonn is not identified by name in the complaint. He is referred to therein as "John Doe I." (J.A. at 200.)
 
 
 [3]
 Peller contends that the officers had to have probable cause to believe that there were no less restrictive alternatives to transporting her to WAH. We disagree. Maryland requires only a reasonable belief that an individual suffers from a mental disorder and is a clear and imminent danger to herself or others to justify a petition for an emergency evaluation. However, before an evaluee may be involuntarily admitted to a hospital, a physician must conclude, among other things, that there is no less restrictive form of intervention available. The Supreme Court requires no more. See O'Connor v. Donaldson, 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975) (requiring an evaluation of less restrictive alternative forms of intervention before confining a mentally ill individual who does not pose a danger to himself or others)
 
 
 [4]
 To the extent that these Maryland officers should be charged with the knowledge of other circuit court decisions, we are convinced that those decisions failed to clarify the law such that these officers should have known that their conduct was unlawful. All of the circuit courts that had addressed the reasonableness of a seizure by police officers of an individual believed to be a danger to herself or others for the purpose of an emergency mental evaluation, had concluded that the officers' actions were reasonable and, therefore, that they were entitled to qualified immunity. See Maag v. Wessler, 960 F.2d 773, 776 (9th Cir.1992) (granting officers qualified immunity who detained individual for emergency mental evaluation pursuant to Montana law and based upon his family's statements that he was acting irrational, his disoriented appearance, and a physician's advice); Chathas v. Smith, 884 F.2d 980, 987 (7th Cir.1989) (granting officers qualified immunity who detained individual for mental observation based upon individual's prior threats to "blow away" police officers, prior incidents in which individual used firearms when upset, and information that individual was under psychiatric care); McKinney v. George, 726 F.2d 1183, 1188 (7th Cir.1984) (granting officers qualified immunity who involuntarily transported individual to mental facility for evaluation after he created a disturbance and ran "naked through the halls" of the police station after he was lawfully arrested); Harris v. Pirch, 677 F.2d 681, 689 (8th Cir.1982) (granting officers qualified immunity who detained woman for emergency mental evaluation when the officer knew of woman's recent hospitalization, she was upset and became angry when questioned, and officer feared she had taken an overdose)
 
 
 [5]
 Peller's argument that the officers are not entitled to the defense of qualified immunity because they did not know that they needed "probable cause" to effectuate a lawful detention is meritless. See Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039-40, 97 L.Ed.2d 523 (1987) (holding that an officer's subjective beliefs are irrelevant when evaluating the reasonableness of their actions); Rowland v. Perry, 41 F.3d 167, 173 (4th Cir.1994) (holding that an "officer's subjective state of mind is not relevant to the qualified immunity inquiry"); see also Maag v. Wessler, 960 F.2d 773, 776 n. 3 (9th Cir.1992) (granting police officers qualified immunity for detaining individual for emergency mental evaluation even though officers could not cite to specific statutory section authorizing their actions)
 
 
 [6]
 The Maryland involuntary commitment statute provides that:
 (a) In general.--A facility or Veterans' Administration hospital may not admit the individual under Part III of this subtitle [i.e., involuntary admission] unless:
 (1) The individual has a mental disorder;
 (2) The individual needs inpatient care or treatment;
 (3) The individual presents a danger to the life or safety of the individual or of others;
 (4) The individual is unable or unwilling to be admitted voluntarily; and
 (5) There is no available, less restrictive form of intervention that is consistent with the welfare and safety of the individual.
 Md.Code Ann., Health-Gen. I § 10-617 (1994).
 
 
 [7]
 We also conclude that Peller fails to meet the requirements of the first and third tests for the reasons stated by the district court. See S.P. v. City of Takoma Park, Md., C.A. No. JFM-95-1295 (D.Md. Dec. 4, 1995) (rejecting the nexus/joint action test because the state does not take away the private physicians' discretion through regulations and Peller failed to allege facts showing a conspiracy between the officers, WAH, and the WAH staff and rejecting the public function test because the involuntary commitment of the mentally ill is not an exclusively public function)
 
 
 [8]
 We disagree with Peller's argument that § 10-624 & § 10-625 of Maryland's involuntary commitment statute require the treatment of an individual meeting certain requirements. While the provisions provide that the hospital and physician "shall" begin treatment upon the finding of certain statutory criteria, the Supreme Court has recently held that, although "shall" generally means "must," it may be construed to mean "should," "will," or even "may." See Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 434 n. 9, 115 S.Ct. 2227, 2236 n. 9, 132 L.Ed.2d 375 (1995). Accordingly, we cannot say that the provisions coerce the private medical parties to involuntarily detain an individual. Rather, we conclude that the legislature's intent was to protect the individual and potentially the general public, not to coerce the involuntary commitment of the individual. See Janicsko v. Pellman 774 F.Supp. 331, 338 (M.D.Pa.1991) (construing similar provisions of Pennsylvania involuntary commitment statute as protective rather than coercive), aff'd, 970 F.2d 899 (3d Cir.1992)
 
 
 [9]
 The American Civil Liberties Union of Maryland filed an amicus brief in support of Peller on this issue only. The ACLU contends that Takoma Park's policy for emergency psychiatric detention violates the Fourth Amendment by allowing police to seize a person for an emergency evaluation without probable cause. (Amicus Br. at 2.)
 
 
 [10]
 Takoma Park has adopted verbatim the Maryland involuntary commitment statute as its own policy
 
 
 [11]
 Peller submitted depositions of Officer Rich, Officer Frishkorn, and Captain Wortman in which they all testified that they believed that "reason to believe," the standard necessary to lawfully detain an individual pursuant to Md.Code Ann., Health-Gen. I § 622(a) (1994), was a lower standard of evidence than probable cause. (J.A. at 411-12, 451-52, 547.)
 
 
 [12]
 Peller argues that a material issue of genuine fact exists because she denied, by affidavit submitted in opposition to summary judgment, making the statements attributed to her by the police officers. In an earlier deposition, however, Peller admitted that she told the officers "something to the effect that I'd just like to get out of here and leave and just not have to deal with anything" and that she used the word "disappear." (Supp. J.A. at 12.) "It is well established that'[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.' " Halperin v. Abacus Tech. Corp., 128 F.3d 191, 198 (4th Cir.1997) (quoting Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir.1984)); see also Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975-76 (4th Cir.1990) (disregarding affidavit of witness that contradicted witness' own prior sworn deposition testimony). Accordingly, Peller's later denial of her statements does not create a genuine issue of a material fact