**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

TERESA SILVER,
Plaintiff-Appellant,

v.                                                                                          No. 99-2121

GENERAL MOTORS CORPORATION,
Defendant-Appellee.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, Chief District Judge.
(CA-98-3148-JFM)

Argued: May 4, 2000

Decided: July 24, 2000

Before MURNAGHAN and TRAXLER, Circuit Judges,
and Jerome B. FRIEDMAN, United States District Judge
for the Eastern District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Joseph Thomas Mallon, Jr., Baltimore, Maryland, for
Appellant. Alison Buell Marshall, JONES, DAY, REAVIS &
POGUE, Washington, D.C., for Appellee. **ON BRIEF:** David A.
Harak, Baltimore, Maryland, for Appellant. Jacqueline M. Holmes,
JONES, DAY, REAVIS & POGUE, Washington, D.C., for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Teresa Silver filed this suit against General Motors Corp. ("GM") on September 17, 1998, alleging sexual harassment and retaliation under § 706(n) of the Civil Rights Act of 1964, as amended.[1] 42 U.S.C. § 2000e-5(f). The district court granted GM's motion for summary judgment on July 20, 1999. On appeal, Silver has abandoned her Title VII retaliation claim, and thus appeals only the district court's grant of GM's motion for summary judgment on her Title VII sexual harassment claim. Finding no error in the court's ruling, we affirm.

I.

GM hired Silver to work at its plant in Shreveport, Louisiana in 1983, and she worked there until 1995, when she asked for a transfer to Baltimore. On June 12, 1995, the transfer was approved, and she began work at the Baltimore plant. While working at the Baltimore plant, Silver acknowledges that she received a copy of the Local Agreement between the Local United Auto Workers ("UAW") and the Baltimore plant. Silver was assigned to the motor line that was supervised by David Rawlings. Rawlings testified that, while employed by GM, he had received a pamphlet informing him that "GM w[ould] not tolerate any sexual harassment in their facilities." He also testified that he knew and understood that certain specific sexual conduct was inappropriate in the workplace. However, he also stated that he was never offered any instruction or training classes pertaining to sexual harassment, nor was sexual harassment discussed in any of the meetings he attended.

Silver claims that Rawlings started harassing her on her first day

_____

[1] In her opposition to GM's motion, Silver voluntarily dismissed her state law claim for intentional infliction of emotional distress.

in the Baltimore plant, by making a comment that he liked southern women. She testified that throughout the time period from June 1995 until November 1996, Rawlings repeatedly told her that it would cost her a night out with him if she ever expected to receive equal treatment. She further testified that Rawlings made comments to her such as "your husband isn't massaging you right, you need a full body massage," "you sure are a good looking woman," and "does your husband tell you how good you are in bed?" She claims that Rawlings continuously brushed up against her even though she had asked him to stop and told him that this behavior offended her. She testified that he would also come up behind her while she was working on the assembly line, lean over her and press his pelvis area into her buttocks, and make sexually explicit remarks. She testified that whenever she asked for a day off, he would tell her "it's going to cost you" and ask her to go out on a date with him. For purposes of summary judgment, GM did not dispute the fact that Rawlings' alleged conduct was sufficiently severe and pervasive and adversely affected Silver's ability to perform her job so as to constitute actionable harassment.

During this period, Silver complained twice to her union representative, Roland Pack, regarding certain "discrimination" in which she believed Rawlings was engaging. On her first day of work, she asked Rawlings to have the air guns with which she worked lowered. He did not act on her request immediately, and Silver complained to Pack. Pack addressed her concern promptly, and the air guns were lowered. Some time later, Silver complained to Pack that her work gloves were too large and that Rawlings refused to order gloves in her size. Pack investigated the situation and brought her a box of twelve dozen gloves in her size.

Silver testified that she reported Rawlings' alleged offensive sexual behavior and comments to her alternate committeemen, Pack and Kip Wirtz, on several occasions during the period from June 1995 to November 1996. She was unable to recall the exact dates of any of her complaints to Pack and Wirtz, except that they occurred at some point between June 1995 through October 1996. There is no record of any calls from Silver regarding sexual harassment during that period.

Silver claims that Pack and Wirtz told her that she could not file a grievance against Rawlings because "that's not the way we do

3

things here in Baltimore," and that in order to file a grievance, she had to go through the union. She also testified that they did not tell her about a UAW EEO official she could contact regarding her complaints. A telephone number for the EEO official appeared in the collective bargaining agreement between GM and the UAW which Silver admits that she possessed but states that she did not read. Silver never contacted the EEO official regarding her complaints of sexual harassment.

On November 8, 1996, Silver did not report to work. When she returned on November 11, 1996, Silver presented a prescription bottle to Rawlings, stating that she did not have a doctor's note. Rawlings told her that he would mark her absence as unexcused, because a doctor's note was required by company policy for an excused absence. Silver stated that she would have the doctor fax a note, and Rawlings allegedly replied that a fax was insufficient. Neither a doctor's note nor a fax were received on Silver's behalf. Silver placed a committee call to Wirtz to contest Rawlings' decision to mark the absence as unexcused. While she was meeting with Wirtz and Henry Addington, a GM manager responsible for addressing attendance issues, on November 13, 1996, Silver broke down in tears and reported Rawlings' sexual harassment.

Silver testified that she complained to Rawlings' supervisors, Addington and Patricia Morga, sometime during September or October of 1996. She could not recall the exact dates that these complaints were made. While Morga testified that "to the best of her recollection," she first met with Silver in October 1996, the remainder of her testimony establishes that she was first informed of Silver's complaint when Wirtz brought it to her attention following his meeting with Silver on November 13, 1996. Notably, Morga stated that during her meeting with Silver regarding her complaint, Silver"started talking about a doctor's note," referring to the conflict over her November 8, 1996 absence. Morga also testified that only a "few days" elapsed between her first discussion with Silver and Rawlings' November 21, 1996 termination.

Addington called William Daniels, the UAW EEO representative assigned to the plant. The next morning, on November 14, 1996, GM began an investigation of Silver's complaint. GM suspended Rawl-

4

ings on November 15, 1996, pending the outcome of the investigation. During the investigation, Sherri Alexander told the investigators that Rawlings had fired her after she repeatedly refused to go on dates with him, although she never filed a complaint with GM regarding this harassment. Another woman, Vanessa Porter, reported general harassment by Rawlings which was not specifically sexual in nature. On November 21, 1996, GM discharged Rawlings due to the results of the investigation that had commenced one week prior.

Silver brought this action against GM on September 17, 1998, alleging sexual harassment and retaliation in violation of Title VII. GM filed a motion for summary judgment on May 19, 1999. On July 20, 1999, the district court granted GM's motion for summary judgment. This appeal follows.

II.

An appeal from a grant of summary judgment is reviewed de novo. See Runnebaum v. NationsBank of Maryland, N.A. , 123 F.3d 156, 163 (4th Cir. 1997). Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). To survive a properly supported motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence produced by the non-moving party is "merely colorable, or is not significantly probative," summary judgment is proper. Anderson , 477 U.S. at 249-50.

III.

In its motion for summary judgment, GM conceded that Mr. Rawlings sexually harassed Silver. Silver suffered no tangible employment action; therefore, GM may avoid vicarious liability from its supervisor's sexual harassment of Silver if it establishes the affirmative defense stated by the Supreme Court in Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Indus. v. Ellerth, 524 U.S. 742 (1998). In order to establish this affirmative defense, GM must prove by a preponderance of the evidence the following: (1) it

5

exercised reasonable care to prevent and promptly correct any sexually harassing behavior; and (2) that Silver unreasonably failed to take advantage of any preventative or corrective opportunities provided by GM, or to avoid harm otherwise. See Faragher, 524 U.S. at 806-08; Burlington, 524 U.S. at 764-65. The district court held that GM met its burden to establish these two elements because (1) GM acted reasonably to prevent harassment to Silver; and (2) Silver unreasonably failed to take advantage of the procedure in place at GM for reporting sexual harassment. Silver challenges both of these holdings on appeal.

A.

The district court held, as a matter of law, that GM"acted reasonably to prevent sexual harassment to [Silver]." Silver has raised the following challenges to this holding: 1) Silver argues that GM's investigation of Rufus Alexander's allegations against Rawlings demonstrates a failure to exercise reasonable care; and 2) Silver argues that GM's dissemination of its sexual harassment policy was ineffectual and unreasonable.

This Court has stated that "the law requires reasonableness, not perfection" in developing, implementing, and enforcing sexual harassment policies and procedures. See Brown v. Perry , 184 F.3d 388, 397 (4th Cir. 1999). In Brown, we held that"the employer must act reasonably, and thus any policy adopted by the employer must be both reasonably designed and reasonably effectual." Id. at 396. An employer's policy may not be deemed unreasonable merely because it proves to be unsuccessful in preventing harassment towards a particular victim, as "[t]he law requires an employer to be reasonable, not clairvoyant or omnipotent." Id.

Silver argues that in 1994 GM did not respond properly to the complaint made by Rufus Alexander about Rawlings' conduct in 1993. Silver also argues that because GM concluded in 1997 that Rawlings' conduct in 1993 was sufficient cause to terminate him, GM failed to exercise reasonable care in 1994 when responding to the complaint. Considering the facts in Brown and the relevant standards, GM acted reasonably as a matter of law. Sherri Alexander, the alleged victim, never complained to anyone at GM, at any time, about Rawlings' alleged sexual harassment. The sole complaint came from Sherri

6

Alexander's father, Rufus Alexander, six months after she had last worked for GM. According to Mr. Alexander, Cook took the complaint "very seriously" and promptly confronted Rawlings with it. Rawlings denied the allegations of harassment, and identified specific performance problems that warranted Ms. Alexander's poor evaluation.

Based on these facts, Cook determined that no further action was warranted, and he informed Mr. Alexander of this conclusion. Mr. Alexander elected not to pursue the complaint any further. Under these circumstances, as in Brown, when an employer decides to respect the employee's wishes and not pursue a complaint, despite the fact that this does not comport with company policy, such action may still be considered reasonable. See id. This Court recognizes that "[s]ometimes, as in this case, an employer's reasonable attempt to prevent future harm will be frustrated by events that are unforeseeable and beyond the employer's control," id., such as the victim's decision not to report or pursue a claim.

Silver also asserts that Rawlings did not know what sexual harassment was, and that in light of Mr. Alexander's allegations, GM should have provided Rawlings with additional pamphlets or sent him to a training class pertaining to sexual harassment. In accordance with the precedent established in Brown, GM was under no duty to take disciplinary action or provide additional materials to Rawlings. See id. Further, the facts indicate that Rawlings had been provided with GM's sexual harassment policy previously. Rawlings testified that he had already received a copy of GM's harassment policy, and he understood that "GM w[ould] not tolerate any sexual harassment in their facilities."[2] Silver alleges that GM's response to Mr. Alexander's complaint was unreasonable because GM later concluded that the allegation was sufficient cause for discharge. However, the law does not require "clairvoyan[ce]" or "omnipoten[ce]." See id. Accordingly, "a good faith investigation of alleged harassment may satisfy the `prompt and adequate' response standard even if the investigation

_____

[2] While Rawlings may not have known the legal definition of sexual harassment, see Rawlings Dep., at 13, 18, he did understand what specific conduct was inappropriate and not tolerated in the workplace. See id. at 46, 47.

7

turns up no evidence of harassment . . . . Such an employer may avoid liability even if a jury later concludes that in fact harassment occurred." Harris v. L&L Wings, Inc., 132 F.3d 978, 984 (4th Cir. 1997).

The district court held that GM had a "widely-known" sexual harassment policy, and that Silver's allegations to the contrary "do not withstand the evidence in this case." Silver claims that "Rawlings never received what [GM] now claims to have been its sexual harassment policy" and that "[Silver] was unaware that [GM] had a sexual harassment policy." However, both Rawlings and Silver testified that they received copies of GM's sexual harassment policy. The district court held that Silver had knowledge of GM's policy against sexual harassment and of the procedures for raising a complaint. She admitted that she received materials regarding sexual harassment, and she stated that she was aware that "it was GM's policy that they would not tolerate sexual harassment." The district court also held that "Rawlings had attended antiharassment training at GM" and that "he understood `very well' the contents of the antiharassment pamphlet that he had received, including that the behavior he was accused of was inappropriate." Thus, the district court correctly concluded that GM satisfied the first prong of the affirmative defense, as the facts demonstrate that GM acted reasonably, and that GM's antiharassment policy was "reasonably designed and reasonably effectual." Brown, 184 F.3d at 396.

B.

With regard to the second element of the affirmative defense, the district court held that Silver "unreasonably failed to take advantage of [GM's] procedures for reporting sexual harassment." The evidence establishes that Silver failed to complain to anyone about Rawlings' behavior until November 13, 1996, seventeen months after the alleged harassment began. Silver, however, claims that she did notify GM and/or the union that Rawlings was harassing her prior to November 13, 1996. Silver relies on: 1) her own testimony; 2) portions of the testimony of Patricia Morga; and 3) hearsay testimony of a third party with no personal knowledge of the relevant events. **3** The district court

_____

**3** The district court held that the testimony of Susan Matulevich, R.N. was hearsay and that it was inconsistent with Silver's own version of

held that none of this evidence created a genuine issue of material fact regarding the timing of Silver's complaints to GM.

It is "well established that [a] genuine issue of material fact is not created where the only issue of fact is to determine which of two conflicting versions of plaintiff's testimony is correct." S.P. v. The City of Takoma Park, 134 F.3d 260, 273 n.12 (4th Cir. 1998). Further, Silver's vague allegations, unsupported by other evidence in the record, cannot defeat a properly supported motion for summary judgment. See, e.g., Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996). While Silver did testify that she repeatedly reported Rawlings' conduct to her alternate committeemen from June 1995 through November 1996, she also stated the following when asked if she had made any committee calls between October 1995 and October 1996: "I don't recall exactly, okay? I don't recall exactly. I would speculate and say yes, but I'm just going to say I don't recall, but I don't want to say something that I'm not real positive."

In addition to her vague and conflicting statements, the district court stated that Silver's assertions regarding the timing of her complaints directly conflict with her contemporaneous statements to her therapist Diane Ollson. On November 18, 1996, Silver told Ollson that she had reported Rawlings' sexual harassment"one w[ee]k ago to the Union." She also told Ollson that she met with Wirtz and Addington on November 13, 1996, and that she met with Morga during that same week. Silver also told Ollson that she had not complained earlier because she was embarrassed and scared. Similarly,

_____

events. Matulevich stated in her deposition that Bob Collins told her that Silver had complained to management "from day one" of Silver's employment in Baltimore. Collins had no personal knowledge of Silver's alleged complaints. Silver argues that Collins' testimony is a "statement by [GM's] agent or servant concerning a matter within the scope of ... employment," and is thus not hearsay under Federal Rule of Evidence 801(d)(2)(D). Collins was working for GM's Personnel Department as a "Disability Case Manager" and was assigned to Silver's disability claim. Collins, however, testified that it was not his responsibility to receive or investigate sexual harassment complaints, and that he had no idea when or to whom Silver first complained. He personally stated that his knowledge was only based on hearsay.

Rick Rainer, an hourly employee who worked beside Silver, testified that he told Silver to complain to someone about Rawlings' inappropriate comments, but her response was that she was afraid to do so.

The specific complaints Silver made before November of 1996 concerned the incidents with the work gloves and the air gun - neither of which relate to sexual harassment, and both of these incidents were resolved to her satisfaction. There are no union records showing that Silver ever complained about sexual harassment prior to November 13, 1996, and the union officials all testified that they had no notice of any such harassment until she complained to Wirtz and Addington on November 13, 1996. In sum, the testimony of sixteen union and management witnesses and six hourly employees, as well as Silver's statements to her therapist and GM's records, all reflect that Silver did not complain of sexual harassment by Rawlings until November 13, 1996.

Silver relies on Morga's testimony that "to the best of [her] recollection" she first met with Silver in October 1996, however, Morga also stated that only a "few days" elapsed between the time she met with Silver and Rawlings' termination. She also stated that during her meeting with Silver regarding her complaint, Silver spoke about a doctor's note, referring to the conflict over her November 8, 1996 absence. Viewing Morga's testimony as a whole, it is consistent with the evidence that Silver did not complain until November 13, 1996. Therefore, the district court correctly concluded that GM satisfied the second prong of the affirmative defense, as Silver unreasonably failed to take advantage of the procedures for reporting sexual harassment; hence, GM cannot be held vicariously liable for Rawlings' harassment of Silver.

IV.

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

10