75 A.3d 359

Gineene WILLIAMS, et al.

v.

PENINSULA REGIONAL MEDICAL CENTER, et al.

No. 0284, Sept. Term, 2012.

Court of Special Appeals of Maryland.

Sept. 5, 2013.

**646**

Michael J. Winkelman (McCarthy, Winkelman & Morrow, LLP, on the brief), Bowie, MD, for Appellant.

Curtis H. Booth (Robert J. Merriken, Cowdrey Thompson, on the brief, Easton, MD), John R. Penhallegon (Richard Martell, Cornblatt, Bennett, Penhallegon & Roberson, PA, on the brief, Towson, MD), for Appellee.

Panel: WOODWARD, ZARNOCH and IRMA S. RAKER (Retired, Specially Assigned), JJ.

ZARNOCH, J.

In this case, members of the family of Charles Williams, Jr. (Gineene Williams, Patricia Gaines, Michelle Crippen, and Charles Williams, Sr.) (collectively, "the family members") appeal a judgment from the Circuit Court for Wicomico County in favor of appellees, Dr. Michael P. Murphy, nursing assistant George Stroop, and Peninsula Regional Medical Center ("PRMC") (collectively, "the health care providers"). Williams was killed by police officers after breaking into a home, obtaining a knife, entering the front yard, and eventually charging at police. The health care providers' role in this story occurred earlier in the day, when Williams' mother brought him to PRMC because of a concern over his mental state. The health care providers evaluated Williams, he said he did not want to be admitted to the medical center, and the health care providers decided not to involuntarily admit him.

The family members brought a wrongful death/survival action in the Circuit Court for Wicomico County.[1] They alleged that the health care providers were negligent in not admitting Williams to the medical center and that their negligence led to his death. In a two-step analysis, Judge W. Newton Jackson, III granted the health care providers' motion to dismiss. First, the court found that under Md.Code

---

[1]. Gineene Williams sued individually and as personal representative of the Estate of Charles Williams, Jr. Gaines and Crippen sued individually and as mother and next friend of three of Williams' children. Charles A. Williams, Sr. sued as the decedent's father.

(1982, 2009 Repl. Vol.), Health–General Article ("H–G"), § 10–618, all health care providers are immune from any liability when they act in good faith and with reasonable grounds in deciding not to involuntarily admit an individual. Second, the court stated that the family members had not alleged in their complaint that the health care providers failed to act in good faith and with reasonable grounds in deciding not to admit Williams to PRMC involuntarily. The family members ask us to review whether the immunity statute applies to this case and whether their complaint failed to state a claim against the health care providers. We conclude that the immunity statute applies to health care providers who evaluate and decide *not* to involuntarily admit an individual. We further determine that a complaint that solely alleges negligence, such as the complaint in this case, is insufficient to overcome the immunity. We therefore affirm the circuit court's dismissal.

## FACTS AND LEGAL PROCEEDINGS

Although the parties disagree sharply on the legal issues in this case, there is no dispute about the facts. On April 20, 2009, Williams' mother brought him to PRMC because she was concerned about his mental state. She was troubled by Williams' suicidal thoughts, his auditory and visual hallucinations, his belief that he was under a curse, his obsessive behavior, headaches, trouble sleeping, and generally unusual behavior.

At PRMC, Williams was examined and evaluated by, at least, Dr. Murphy and Stroop.[2] During these exams, Williams was alert, verbal, and cooperative in discussing his symptoms. He admitted that he was having auditory and visual hallucinations and suicidal thoughts. He told the health care providers that he was communicating with "the Lord," that his ex-girlfriend had placed a curse on him, and that he suffered blindness when he looked at a text message sent from her

---

2. The family members note in their brief that other members of PRMC performed psychological evaluations, but they did not name any additional individuals in their complaint.

while in the emergency room. The health care providers learned that Williams had cuts on the inside of his arms. Williams refused to discuss the possibility of inpatient care. The health care providers noted that he "appear[ed] to be minimizing any problems going on with him."

After evaluating Williams, the health care providers decided not to involuntarily admit Williams. He was diagnosed with insomnia, fatigue, and bizarre behavior. He was prescribed Ambien and his mother was advised to remove the firearms from the residence, follow up with Lower Shore Clinic the next day, and return to the hospital if the symptoms became worse. Williams was also told to "return here immediately if you feel you are going to harm yourself or anyone else."

After leaving PRMC, Williams left his mother and went to a restaurant with his children and their mother, Michelle Crippen. Williams' mother filled his prescription and took it to the restaurant. Williams left the restaurant with Crippen but, at some point, he asked her to pull the vehicle to the side of the road. He jumped out. Members of the police department saw him in Salisbury later in the day and noted that he was acting strange. At the time, he was not engaging in any activity that would have caused the police to detain him. But shortly before midnight he broke into a house. The resident saw him and called 9-1-1. When the police arrived, Williams was in the front yard wielding a knife. He said to the officers: "shoot me, fucking shoot me, somebody's going to die tonight." He held the knife to his throat and said: "I want you to shoot me, I want to die." The officers told Williams to drop the knife and surrender himself. He refused and charged at the officers. The officers shot Williams, but he persisted in his attack. The officers shot Williams 15 times and he died from the gunshot wounds.

Williams' family members initially brought a claim in the Health Care Alternative Dispute Resolution Office. They filed a statement of claim, a certificate of merit of a qualified expert, and two medical reports from two separate physicians. When this did not resolve the claim, the family members filed

a complaint in the circuit court against the health care providers alleging negligence. PRMC and Stroop filed a motion to dismiss, which Dr. Murphy joined. The health care providers contended that H–G § 10–618 in conjunction with Md.Code (1974, 2006 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"), § 5–623(c)-(d) gave them immunity, and in the alternative, Williams' death was so remote in time and place so as not to be reasonably foreseeable as a matter of law. The circuit court granted the motion to dismiss, finding that the immunity statute applied to the health care providers' actions and that the family members had not alleged any facts to overcome the immunity. The family members timely appealed.

The rationale behind the court's decision and the contents of the family members' complaint will be discussed below as they relate to each question presented.

## QUESTIONS PRESENTED

The family members present two questions for review, which we have reworded to properly capture the issues:[3]

1. Was the circuit court correct in interpreting Maryland's involuntary admission immunity statute, H–G § 10–618, to apply to health care providers who evaluate an individual and decide to discharge the patient from psychiatric care?

2. Was the circuit court correct in finding the family members' complaint failed to allege facts that would

---

**3.** The family members framed the questions presented in the following fashion:

 1. The Circuit Court interpreted a Maryland statute which provides immunity to health care providers who involuntarily commit persons to also apply to health care providers who negligently treat patients presenting with psychiatric symptoms. Was the Circuit Court correct?

 2. Was the Circuit Court legally correct in dismissing a medical malpractice action which was supported by a certificate of merit and medical report from two Board-certified physicians?

overcome Maryland's involuntary admission immunity statute?

For reasons more fully explained below, we answer these questions in the health care providers' favor and uphold the decision below.[4]

## STANDARD OF REVIEW

 This Court reviews the grant of a motion to dismiss for failure to state a claim for which relief can be granted under a *de novo* standard. *Clark v. Prince George's Cnty.*, 211 Md.App. 548, 557, 65 A.3d 785 (2013). "In reviewing the grant of a motion to dismiss, we must determine whether the complaint, on its face, discloses a legally sufficient cause of action. An appellate court should presume the truth of all well-pleaded facts in the complaint, along with any reasonable inferences derived therefrom." *Id.* (Citations and internal quotation marks omitted). Dismissal of the action is only warranted "if the allegations and permissible inferences, if true, would not afford relief to the plaintiff." *Gomez v. Jackson*, 198 Md.App. 87, 93, 16 A.3d 261 (2011) (Citations omitted).

 This appeal also requires us to construe a Maryland statute. We interpret Maryland statutes without giving any deference to the circuit court's interpretation. *See Davis v. Slater*, 383 Md. 599, 604, 861 A.2d 78 (2004).

## DISCUSSION

### I. Interpretation of the Immunity Statute

At the outset, we are called upon to determine whether H–G § 10–618 controls the outcome of this case. The parties disagree on whether the statute applies to the health care providers' actions in deciding not to involuntarily admit

---

4. The health care providers separately ask us to review the court's failure to find that they were not the proximate cause of Williams' death. In light of our affirmance of the dismissal, we need not address this issue.

Williams to PRMC. Thus, we embark on a journey of statutory construction. We have noted that many issues of statutory construction are resolvable on the basis of judicial consideration of three general factors: (1) text; (2) purpose; and (3) consequences. *Town of Oxford v. Koste,* 204 Md.App. 578, 585, 42 A.3d 637 (2012), *aff'd,* 431 Md. 14, 63 A.3d 582 (2013); *Goss v. Estate of Jennings,* 207 Md.App. 151, 169, 51 A.3d 761 (2012). In *Goss,* we said:

> Text is the plain language of the relevant provision, typically given its ordinary meaning, viewed in context, considered in light of the whole statute and generally evaluated for ambiguity. Legislative purpose, either apparent from the text or gathered from external sources, often informs, if not controls, our reading of the statute. An examination of interpretive consequences, either as a comparison of the results of each proffered construction or as a principle of avoidance of an absurd or unreasonable reading grounds the court's interpretation in reality.

*Id.* at 169–70, 51 A.3d 761 (Citations and internal quotation marks omitted). This is a case where the text of the relevant provision is the predominant factor.

**A. Text**

H–G §§ 10–101 *et seq.* is the State's Mental Hygiene Law. Subtitle 6 of Title 10 is divided into five "parts." [5] Part III, labeled "Involuntary Admissions," includes the application procedure, the process for admission, the evaluation requirements, the limitations on admissions, and a provision granting immunity for the individuals and health care providers. *See* §§ 10–613–619. Section 10–618 confers the immunity:

> (a) A person who applies for involuntary admission of an individual shall have the immunity from liability described under § 5–623(b) of the Courts and Judicial Proceedings Article.

---

5. In the Code Revision process, a "part" is an informal unit of statutory organization. Its headings, captions, or labels are not deemed part of the law. *See* Chapter 21, *Laws of 1982* at Section 4.

(b) A facility or Veterans' Administration hospital that acts in compliance with the provisions of Part III of this subtitle shall have the immunity from liability described under § 5–623(c) of the Courts and Judicial Proceedings Article.

(c) An agent or employee of a facility or Veterans' Administration hospital who acts in compliance with the provisions of Part III of this subtitle shall have the immunity from liability described under § 5–623(d) of the Courts and Judicial Proceedings Article.

CJP § 5–623(b)–(d) further describes this immunity: [6]

(b) A person who in good faith and with reasonable grounds applies for involuntary admission of an individual is not civilly or criminally liable for making the application under Title 10, Subtitle 6, Part III of the Health–General Article.

(c) A facility or veterans' administration hospital that, in good faith and with reasonable grounds, acts in compliance with the provisions of Title 10, Subtitle 6, Part III of the Health–General Article is not civilly or criminally liable for that action.

(d) An agent or employee of a facility or veterans' administration hospital who, in good faith and with reasonable grounds, acts in compliance with the provisions of Title 10, Subtitle 6, Part III of the Health–General Article is not civilly or criminally liable for that action.

All parties in this case assert that the language of § 10–618 is unambiguous in favor of their respective interpretations. The family members argue that the statute provides immunity for liability for individuals who take certain steps only when those steps lead to the involuntary admission of a person. They contend that the statute only applies to involuntary admission because Part III is labeled "involuntary admission" and the words also appear in CJP § 5–623(a) and H–G § 10–618(a). Williams was never admitted, so his family members

---

**6.** A similar provision for "Emergency Evaluations" is found in H–G § 10–629.

contend that the involuntary admission statute does not apply to his situation.

The circuit court disagreed and adopted the health care providers' interpretation, concluding that the statute unambiguously applied to any evaluation for involuntary admittance, regardless of whether the health care providers decide to admit the patient or release them. In making his determination, Judge Jackson reasoned:

The Health–General Article contains over 20 Titles, one of which is Title 10 entitled "Mental Hygiene Law." Title 10 has 14 Subtitles, one of which is Subtitle 6 entitled "Admission Provisions." Part III thereof concerns itself with "Involuntary Admissions." Section § 10–618 . . . is found in Part III.

Another statute found in Part III is H–G § 10–617, which is entitled "Admission Limitations." Subsection (a) reads:

(a) In general.—A facility or Veterans' Administration hospital may not admit the individual under Part III of this subtitle unless:

(1) The individual has a mental disorder;

(2) The individual needs inpatient care or treatment;

(3) The individual presents a danger to the life or safety of the individual or of others;

(4) The individual is unable or unwilling to be admitted voluntarily; and

(5) There is no available, less restrictive form of intervention that is consistent with the welfare and safety of the individual.

The "exemption from liability" statute found at H–G § 10–618 does not limit itself to situations where a patient is *involuntarily* admitted. In this judge's opinion, it covers all aspects of the involuntary admission process, including when the facility deems it inappropriate to admit someone involuntarily. Both subsections (b) and (c) posit immunity on "compliance with the provisions of Part III of this subtitle." As stated previously[,] Part III includes H–G § 10–617 which sets forth the necessary factors for involun-

tary admission. Therefore, a health care provider acts in compliance with Part III when a good faith evaluation leads to commitment, but it also acts in compliance with Part III when the conclusion of a good faith evaluation is that a less restrictive form of intervention than commitment is warranted. In either case, Health Gen. 10–618 provides the hospital and its agents with immunity from suit.

The circuit court's interpretation of this statute is sound. The title "involuntary admission" can include an evaluation for such admission. The statute provides that a facility or a veterans' administration hospital and their agents and employees are not civilly or criminally liable for any action taken in good faith and with reasonable grounds in compliance with the provisions of Title 10, Subtitle 6, Part III of the Health–General Article. *See* CJP § 5–623. The limitations on involuntary admission, H–G § 10–617, is one provision under Part III. Thus, as the court explained, admitting someone who meets the described criteria in H–G § 10–617 would be acting in compliance with Part III. In turn, deciding not to admit someone who did not meet the criteria would also be acting in compliance with Part III.

Additionally, the very same exception from liability appears in Part IV of Title 10, captioned, "Emergency Evaluations." This immunity provision, H–G § 10–629, was added to the law at the same time as H–G § 10–618. Chapter 459, *Laws of 1982.* The short title of the legislation reads: "Involuntary Admissions and Emergency Evaluations—Liability." In light of this fact and that "evaluation" provisions are included in Part III's "compliance" requirements, it seems extremely unlikely that the General Assembly did not intend to protect both emergency evaluation decisions and involuntary admission decisions—including negative ones.

■ The family members' emphasis on the label/caption of Part III fails for two reasons. First, this heading is not part of the law. *See* n.5, *supra.* Second, captions do not control the plain meaning of the text. *See State v. Holton,* 193 Md.App. 322, 365, 997 A.2d 828 (2010), *aff'd,* 420 Md. 530, 24

A.3d 678 (2011). Their contention that H–G § 10–618 itself limits the immunity to admitting misreads the provision. The "involuntary admission" language in § 10–618 applies only to applicants not institutions or providers covered by § 10–618(b)–(c). The latter immunity more broadly applies to all acts encompassed within Part III.

■ Reading the statute as a whole and viewing the immunity statute within the context of the statutory scheme to which it belongs, the medical professionals would be covered under the immunity provision if they acted in good faith and with reasonable grounds when they made the decision to admit or not to admit. Thus, we conclude that the statute's language is unambiguous and provides immunity to any health care provider who conducts an evaluation for involuntary admission, acting in good faith and with reasonable grounds, whether or not that evaluation leads to an admittance or some less restrictive care.

### B. Purpose/Consequences

Even if we assumed that the immunity statute's language was ambiguous and we turned our attention to the purpose of the statute and consequences of the family members' interpretation, our conclusion would be the same. The legislative history of the 1982 enactment is not conclusive on whether the General Assembly envisioned the statute to apply to anyone who engaged in the process of evaluating an individual for involuntary admission or only someone who decided to involuntarily admit an individual.[7] Nevertheless, there are other relevant indications of legislative purpose.

---

7. Statutes dealing with admission into a mental facility were formerly part of Article 59. The section on immunity only dealt with immunity for a person who applies for involuntary admission of an individual. As part of code revision, this section was transferred to the Health General Article when the General Assembly enacted H–G § 10–618 in 1982. The addition of immunity for the facilities and its employees was added at that time and there have been no material changes to the language since then. The only change was to move "in good faith with reasonable grounds" and "is not civilly or criminal liable" to CJP § 5–623 and

■ Statutory provisions regulating involuntary admission to mental facilities are put in place to protect citizens from unnecessary commitment. "[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Anderson v. Dep't of Health and Mental Hygiene*, 310 Md. 217, 228, 528 A.2d 904 (1987) (Citation and internal quotation marks omitted). Thus, procedures for admittance help ensure that steps are taken to only admit an individual who is truly suffering from a mental condition and is a danger to him or herself or others [8] before taking away the individual's liberty. Accordingly, most provisions dealing with involuntary admission are a series of steps that must be taken before someone is involuntarily admitted. *See* H–G §§ 10–615–617. And even if those steps are followed and an individual is admitted, a hearing must be held shortly after to determine whether the person should be released. *See* H–G § 10–632.

In the same year that these stringent involuntary admission procedures were passed, the General Assembly considered several bills aimed at protecting the rights of mentally ill individuals. *See* Senate Bill 676 (1982); House Bill 1429 (1982). In testifying for these bills, a representative of the Mental Health Association of Maryland, Inc. said:

---

then to simply make reference in H–G § 10–618 that the immunity was described under the CJP section.

Williams' family members argue that the purpose described in the title of the bill that enacted H–G § 10–618 specifically limits the health care providers immunity to situations where an individual is involuntarily admitted. The purpose clause of the title reads: "For the purpose of protecting certain individuals and institutions from civil or criminal liability under certain conditions relating to involuntary admissions, emergency evaluations, and emergency involuntary admissions, and making structural changes." Md. House Bill 1709, 1982 Md. Laws 3021. This Court does not read a limitation from the purpose clause. In fact, "certain conditions relating to involuntary admissions" very likely includes any evaluation for involuntary admission even when admission is not recommended.

8. Last session, legislation which would have defined this standard passed the Maryland Senate. SB 1040 (2013). However, no action was taken on the measure in the House.

In recent years, it has become increasingly clear to mental health advocates nationwide that is essential to establish these rights legislatively. We recognize the increasing court involvement which has resulted in many landmark decisions addressing gross systemic abuses. However, we are concerned and convinced that the courts alone cannot provide the standards and mechanisms that assure good patient care and guarantee that rights are respected and protected.... We believe it is the responsibility of all mental health providers to assure the rights of mental patients.

*Testimony on SB 676 and HB 1429,* March 9–10, 1982. Although a bill of rights for mentally ill individuals in facilities was not passed that year, one was passed the following year. *See* H–G §§ 10–701 *et seq.*

Understanding the deep concern for patient rights and stringent requirements for involuntary admittance, it would lead to an absurd result if we were to interpret the immunity provision to only apply when someone is actually admitted. In one breath the statute would discourage admitting individuals before a careful evaluation, but in the next breath provide immunity only when the decision is to admit. Out of fear of liability, mental health professionals might err on the side of admittance, instead of properly exercising their discretion and following the stringent requirements before taking away someone's liberty.

Two Fourth Circuit Decisions, focusing on Maryland's involuntary commitment scheme, support this conclusion. In *S.P. v. City of Takoma Park,* 134 F.3d 260, 268–69 (4th Cir.1998), the United States Court of Appeals rejected the contention that a private physician and a private hospital were state actors for purposes of civil rights liability because they were compelled to involuntarily detain and admit an individual. The appellate court said:

A review of Maryland's entire involuntary commitment statutory scheme ... convinces us that it is permissive and leaves a great deal of discretion to the private medical

provider.... [Maryland] does not mandate the initiation of involuntary commitment proceedings whenever the state-prescribed criteria are met. Rather, it states that such proceedings cannot be initiated absent the existence of the criteria.

*Id.* at 270. The Court concluded "that the legislature's intent was to protect the individual and potentially the general public, not to coerce the involuntary commitment of the individual." *Id.* at 270 n. 8.

In *Farwell v. Un*, 902 F.2d 282 (4th Cir.1990), the Fourth Circuit echoed these thoughts in describing the purpose of both Maryland's and Delaware's involuntary commitment statutes and their relationship to duty of care in a negligent failure to admit case:

[W]e think the limits of any such duty are implied, though not wholly defined, by the constraints imposed upon physicians by the involuntary commitment statutes. These bespeak legislative concerns, as matters of the relevant states' public policies, in the rights of competent patients not to be subjected to paternalistic actions by their physicians, no matter how well-meaning and professionally warranted, that might intrude on their patients' dignity and privacy interests. State law, based upon a deliberate balancing of the interests at stake, compels physicians in this context to defer to their patients' privacy and dignitary interests in ways that obviously may run counter to the physician's professional judgment about a patient's "best interests" and indeed may involve a known degree of risk to the patient's well-being.

*Id.* at 289.

Other states have reached conclusions similar to ours regarding the purpose of immunity provisions relating to involuntary admissions. In *Taylor v. Herst*, 537 A.2d 1163, 1166 (Me.1988), a Maine court reasoned: "Without protection from civil liability, physicians would be discouraged from examining persons for involuntary commitment, thereby making the process unworkable.... [I]f release decisions were exposed to the

threat of liability those individuals charged with rendering those decisions would likely become unduly responsive to one consideration—the cost of liability." (Citation and internal quotation marks omitted). In *Ziemba v. Riverview Med. Ctr.*, 275 N.J.Super. 293, 645 A.2d 1276, 1280 (Ct.App.Div.1994), a New Jersey court commented:

> "[Involuntary] commitment is best decided by appropriate mental health care professionals, and, as such, the commitment decision is discretionary. To protect this discretionary procedure and to allow mental health care workers to perform their jobs freely, the Legislature has provided immunity from civil and criminal liability for those involved in the commitment of an individual for mental health reasons."

In our view, the purpose of the immunity statute at issue in this case is to protect the discretionary nature of the evaluation so that the medical professionals can be guided by their medical judgment and not the fear of liability. To do so, the statute must protect those who decide to involuntarily commit a patient as well as those who decide *not* to involuntarily commit a patient. As the circuit court pointed out in this case, "[i]t makes no sense for the legislature to grant immunity when someone is involuntarily committed but to deny it when he is not. The clear legislative intent is to allow health care providers to exercise sound medical judgment in making such decisions without being unduly influenced by the threat of litigation." We believe this adequately captures the purpose of the immunity statute. The statute protects health care providers from any and all claims related to their decision to admit or not to admit.

For these reasons, we conclude the court correctly interpreted the immunity statute to apply to the health care providers' decision not to admit Williams' involuntarily.

## II. Good Faith and With Reasonable Grounds

### A. Meaning of the Statute

The family members argue that even if the immunity statute applies, the standard of acting in "good faith" and "with

reasonable grounds" is functionally equivalent to the standard for negligence. Thus, they argue, because negligence is an issue for the trier of fact, so too is whether the health care providers acted with reasonable grounds. The family members contend that they submitted the opinions of two medical experts who opined that the health care providers violated the standard of care. They argue that the health care providers could not have acted with reasonable grounds if they violated the standard of care. Thus, they contend that their complaint sufficiently stated a claim against the health care providers.

■ In addressing this argument, the circuit court stated that the family members were improperly "equating 'good faith/reasonable grounds' with ordinary negligence." The court determined that this could not have been the intent of the legislature in enacting the immunity statute because it would "vitiate the concept of 'immunity' by adding another step in the litigation process." This is because, the court explained, if good faith/reasonable grounds was always a jury issue, then health care providers would need to "mount a full fledged defense involving costly expert witnesses just to adjudicate" that issue.

We agree with the circuit court. Under the family members' interpretation of the immunity statute, medical professionals would not be held liable unless they acted negligently. This interpretation would render the statute unnecessary and truly useless, because even without the statute, medical professionals cannot be liable absent negligence.

In 1982—the same year that the involuntary admittance immunity statute was passed—Governor Harry Hughes vetoed a bill seemingly providing immunity if there was no negligence. *See* 1982 Md. Laws 5015 (vetoes). The bill read, in part, "[a]n operator of an emergency vehicle, who is authorized to operate the emergency vehicle by its owner or lessee, is not liable in his individual capacity, when exercising reasonable care, for any damages resulting from a tortious act or omission within the scope of performing emergency service." *Id.* at 5016. In explaining the reason for vetoing the bill, the

governor wrote "[t]he bill as originally drafted and as amended has given rise to certain severe interpretive problems which the Attorney General believes will unnecessarily perplex both courts and litigants." *Id.* at 5017. In his letter to the governor, Attorney General Stephen Sachs wrote that the bill "seems to say that an operator is not liable in tort if he exercises reasonable care. But, under such circumstances, he would not be liable in tort in any event, be it for negligence or gross negligence." *Id.* at 5019.

The same rationale applies to the immunity statute. The statute must provide medical professionals with more protection from liability than they had before the statute. Although the amount of protection may be open to debate, it must be at least a protection from mere negligence.[9] In turn, when health care providers are acting in accordance with the involuntary admission statute and a plaintiff files suit over their decision to admit or not to admit a patient, the plaintiff must allege something more than negligence or risk dismissal for failure to state a claim.

### B. The Complaint

 The family members fell well short of the minimum required to overcome the immunity statute. Their complaint

---

**9.** The standard for good faith in a similar statute was discussed in *Ziemba.* There, a New Jersey court reasoned, upon a summary judgment motion, that the record demonstrated a *prima facie* showing that the defendants acted in good faith and took reasonable steps to evaluate the plaintiff. 645 A.2d at 1280. The court explained that the defendant presented evidence that police officers interviewed the plaintiff, the officers took him to a medical center, an emergency room physician evaluated plaintiff, another doctor began a psychiatric screening process, a third doctor interviewed and evaluated the plaintiff, a fourth doctor conducted a similar evaluation, and then the last three doctors discussed their findings before making any decisions about involuntary admission. *Id.* The court further found that the plaintiff had done nothing to show these steps were not conducted properly. *Id.* at 1281. Although this case deals with summary judgment and not a motion to dismiss, the standard for what qualifies as good faith and reasonable grounds is instructive. The court's focus for this standard was not the details of whether the doctors should or should not have admitted the patient, but instead, the analysis was limited to whether the process was proper.

did not allege anything other than negligence. Count I states, in relevant part:

29. That the care and treatment provided by the Defendants during the April 20, 2009, hospitalization at [PRMC] was in violation of the standard of care.

30. That the violations of the standard of care by the Defendants include, but are not limited to, failure to appreciate the signs and symptoms demonstrated by Mr. Williams and relationship to the potential for harm to Mr. Williams or others[;] failure to perform appropriate tests to determine the appropriate diagnosis and treatment; failure to monitor and control Mr. Williams; failure to appreciate the seriousness of the [*sic*] Mr. Williams' condition; failure to ensure Mr. Williams['] stability, mental or otherwise[,] prior to discharging Mr. Williams[;] failure to admit and/or arrange for the transfer of Mr. Williams to the appropriate facility(ies) which could have appropriately treated Mr. Williams, whether or not such an admittance and/or transfer was to be done against Mr. Williams' will; failure to release Mr. Williams to the appropriate individuals[;] and a general failure to properly care for Mr. Williams who was exhibiting bizarre and dangerous behavior.

31. That as a result in the above breaches in the standard of care Mr. Williams was permitted to leave the hospital and continue with his bizarre and reckless behavior.... More likely than not Mr. Williams would not have broken into the home and had the confrontation with police on the evening of April 20, 2009 if he had been properly treated by Defendants.

32. That as a further direct and proximate result of the breaches in the standard of care by the Defendants set forth above, Mr. Williams was caused to be shot and ultimately killed after being discharged from [PRMC]....

Count II states, in relevant part: "36. That as a result of the negligence and breach of the standard of care articulated above by the Defendants, jointly and severally, the Plaintiffs ... have suffered loss...."

The complaint does not even allege, let alone provide facts to support the failure of the health care providers to act in good faith and with reasonable grounds. The family members never discuss a failure in the statutory process of evaluation. Instead, their primary concern is that the evaluations of Williams were simply bad judgment. This contention focuses on whether the health care providers were negligent, not whether they acted in good faith and with reasonable grounds. Thus, even if the facts and allegations in the complaint were true, they would not afford relief to the family members. Under these circumstances, the circuit court was correct in granting the motion to dismiss.

**JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**