*Gineene Williams, et al. v. Peninsula Regional Medical Center, et al.*, No. 18, September Term, 2014, Opinion by Adkins, J.

**MEDICAL MALPRACTICE LIABILITY — MENTAL HYGIENE LAWS — INVOLUNTARY ADMISSIONS — STATUTORY IMMUNITY:** Health care providers are immune from liability both when they evaluate and involuntarily admit an individual and when they evaluate and decide not to involuntarily admit an individual.

Circuit Court for Wicomico County
Case No.: 22-C-11-000198
Argued: 10/3/2014

IN THE COURT OF APPEALS

OF MARYLAND

No. 18

September Term, 2014

GINEENE WILLIAMS, etc., et al.

v.

PENINSULA REGIONAL MEDICAL
CENTER, et al.

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

Opinion by Adkins, J.

Filed: November 21, 2014

In this tragic case, a young man, age 34, was brought to a hospital emergency room suffering from suicidal ideation and auditory and visual hallucinations. After evaluating him, health care providers decided not to admit him for psychiatric treatment and discharged him to the care of his mother. That same night, he was killed by law enforcement officers after inviting the officers to shoot him, and then aggressively rushing them. Our task is to decide whether hospital and health care providers enjoy statutory immunity against a wrongful death and survivorship action alleging negligence in the decision to release rather than involuntarily admit the young man to the hospital.

## FACTS AND PROCEEDINGS

On April 20, 2009, Gineene Williams brought her son, Charles Williams, Jr., to Peninsula Regional Medical Center ("PRMC"), where Dr. Michael P. Murphy and mental health worker George Stroop (collectively with PRMC, "the Health Care Providers") examined and evaluated him.[1] Williams had been suffering with suicidal ideation and auditory and visual hallucinations. Although alert and cooperative during his examination, Williams informed the Health Care Providers that he was "communicating with 'the lord[,'] that he believed his ex-girlfriend had placed a curse on him[,] and that he had suffered blindness when he looked at a text message from her while in the emergency

---

[1] Although undisputed, these facts are drawn from Plaintiffs' Complaint and are accepted as true and viewed in the light most favorable to Plaintiffs, as they must be on appellate review of the grant of a defendant's motion to dismiss. *See Heavenly Days Crematorium, LLC v. Harris, Smariga & Assocs.,* 433 Md. 558, 562, 72 A.3d 199, 201 (2013).

room." During the examination, the Health Care Providers noted cuts on the inside of Williams's arms and that he "minimiz[ed] any problems going on with him."

Upon completing the examination, the Health Care Providers elected not to admit Williams, discharging him to the care of his mother and advising her to remove any firearms from the home. Williams received a discharge diagnosis of "insomnia, fatigue, [and] bizarre behavior," a prescription for the sedative Ambien, and instructions to return if he felt that he would harm himself or others.

Immediately after discharge, Williams absconded from his mother's care and went to a restaurant with his children and their mother, Michelle Crippen. At some point upon leaving the restaurant, Williams demanded that Crippen pull her vehicle to the side of the road. He exited the vehicle and disappeared. Shortly before midnight, after spending several hours wandering the streets of Salisbury, Williams broke into a residence, at which time the homeowner notified police. Upon arrival, officers encountered Williams in the front yard of the residence wielding a knife and saying, "shoot me, f***ing shoot me, somebody's going to die tonight." He then held the knife to his throat and declared, "I want you to shoot me, I want to die." When Williams rushed the officers, they fired their weapons at him. When he persisted, the officers fired again, killing him.

Plaintiffs Gineene Williams,[2] Patricia Gaines, Michelle Crippen, and Charles A. Williams, Sr. ("the Family" or "Plaintiffs") filed a wrongful death and survivorship action

---

[2] Gineene Williams was appointed Personal Representative of Williams's estate, and was thus entitled to bring a survivorship claim. *See* Md. Code (1974, 2011 Repl. Vol.), § 7-401 of the Estates and Trusts Article.

against the Health Care Providers in the Circuit Court for Wicomico County, alleging negligence, including (1) a "failure to appreciate the signs and symptoms" exhibited by Williams, (2) a failure to perform the appropriate diagnostic tests, (3) a "failure to appreciate the seriousness" of Williams's condition, (4) a "failure to admit" Williams, and (5) a "general failure to properly care for" Williams. No bad faith was alleged.

The Health Care Providers filed Motions to Dismiss, arguing that the Complaint failed to state a claim upon which relief could be granted, that they were entitled to statutory immunity, and that the Complaint failed to assert that the actions of the Health Care Providers were the proximate cause of Williams's injuries. After hearing arguments, the Circuit Court granted the Motions to Dismiss, concluding that the Health Care Providers were protected from liability by statutory immunity. The Family appealed to the Court of Special Appeals, which affirmed the decision of the Circuit Court. *Williams v. Peninsula Reg'l Med. Ctr.*, 213 Md. App. 644, 75 A.3d 359 (2013).

We granted the Family's Petition for Writ of Certiorari to answer the following question:

> Does Maryland's involuntary admission immunity statute, [Md. Code (1982, 2009 Repl. Vol.), § 10-618 of the Health-General Article], apply to health care providers who evaluate an individual and decide to discharge the patient from psychiatric care?[3]

---

[3] Plaintiffs include a second question presented in their brief, arguing that the Court of Special Appeals erred when it imposed a heightened pleading standard. Because Plaintiffs did not present this issue in their Petition for Writ of Certiorari, we decline to address it. *See* Md. Rule 8-131(b) ("Unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered by the Court of Special Appeals or by a circuit court acting in an appellate capacity, the Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that

3

Because we answer yes, we shall affirm the judgment of the Court of Special Appeals.

**STANDARD OF REVIEW**

The standard of appellate review of a lower court's grant of a motion to dismiss is well-settled: "[i]n reviewing the underlying grant of a motion to dismiss, we must assume the truth of the well-pleaded factual allegations of the complaint, including the reasonable inferences that may be drawn from those allegations." *Debbas v. Nelson*, 389 Md. 364, 372, 885 A.2d 802, 807 (2005) (citations omitted). We review these issues as a matter of law. *See Davis v. Slater*, 383 Md. 599, 604, 861 A.2d 78, 80–81 (2004) (citations omitted) (stating that interpreting the Maryland Code is a matter of law).

**DISCUSSION**

The single question presented by the Petitioners unfolds in their brief as two distinct issues. First, they read the text of Md. Code (1982, 2009 Repl. Vol.), § 10-618 of the Health-General Article ("HG") and Md. Code (1973, 2013 Repl. Vol.), § 5-623 of the Courts and Judicial Proceedings Article ("CJP") narrowly. They would have us interpret the statutory scheme to limit immunity to those individuals who apply for the involuntary admission of another and exclude those who perform the involuntary admission evaluation. Second, Plaintiffs contend that the immunity provided by HG § 10-618 and CJP § 5-623

has been preserved for review by the Court of Appeals."); *Richmond v. State*, 330 Md. 223, 235, 623 A.2d 630, 636 (1993) ("[T]his Court ordinarily will not consider an issue not included in the petition for certiorari."), *abrogated on other grounds by Christian v. State*, 405 Md. 306, 951 A.2d 832 (2008).

applies only if the patient is admitted to the hospital, not in instances in which the individual is evaluated and released.

The Health Care Providers read this legislation more expansively. They contend that both the plain language and underlying purpose of HG § 10-618 and CJP § 5-623 dictate that statutory immunity extends to health care providers who perform an evaluation and decide not to involuntarily admit an individual. Counseling against our adoption of the Family's view, they warn that such a narrow reading of statutory immunity would create a perverse incentive for health care providers to involuntarily admit individuals to avoid potential liability.

Here, we are asked to address the statutory immunity conferred in HG § 10-618, which cross-references CJP § 5-623. Section 10-618 provides:

> (a) A person who applies for involuntary admission of an individual shall have the immunity from liability described under § 5-623(b) of the Courts and Judicial Proceedings Article.
>
> (b) A facility or Veterans' Administration hospital that acts in compliance with the provisions of Part III of this subtitle shall have the immunity from liability described under § 5-623(c) of the Courts and Judicial Proceedings Article.
>
> (c) An agent or employee of a facility or Veterans' Administration hospital who acts in compliance with the provisions of Part III of this subtitle shall have the immunity from liability described under § 5-623(d) of the Courts and Judicial Proceedings Article.

The subsections in HG § 10-618 correspond to relevant subsections in CJP § 5-623, which

states in part[4]:

> (b) A person who in good faith and with reasonable grounds applies for involuntary admission of an individual is not civilly or criminally liable for making the application under Title 10, Subtitle 6, Part III of the Health-General Article.
>
> (c) A facility or veterans' administration hospital that, in good faith and with reasonable grounds, acts in compliance with the provisions of Title 10, Subtitle 6, Part III of the Health-General Article is not civilly or criminally liable for that action.
>
> (d) An agent or employee of a facility or veterans' administration hospital who, in good faith and with reasonable grounds, acts in compliance with the provisions of Title 10, Subtitle 6, Part III of the Health-General Article is not civilly or criminally liable for that action.

"The cardinal rule of statutory interpretation is to ascertain and effectuate the intent

of the Legislature." *Kushell v. Dep't of Natural Res.*, 385 Md. 563, 576, 870 A.2d 186,

---

[4] CJP § 5-623 also defines "Admission" and "Facility" by cross-reference to HG § 10-101, which defines the terms as follows:

> (c)(1) "Admission" means the process by which an individual is accepted as a resident in:
> > (i) An inpatient facility; or
> > (ii) A Veterans' Administration hospital in this State that provides care or treatment for individuals who have mental disorders.
> (2) "Admission" includes the physical act of the individual entering the facility or Veterans' Administration hospital.
> > \* \* \*
> (e)(1) Except as otherwise provided in this title, "facility" means any public or private clinic, hospital, or other institution that provides or purports to provide treatment or other services for individuals who have mental disorders.
> (2) "Facility" does not include a Veterans' Administration hospital.

193 (2005). Therefore, we must determine whether the General Assembly intended to provide the Health Care Providers immunity from liability. In ascertaining legislative intent, we return to our oft-repeated canons of statutory construction:

> [W]e begin with the normal, plain meaning of the language of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction. . . . We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute.

*Lockshin v. Semsker*, 412 Md. 257, 275–76, 987 A.2d 18, 28–29 (2010) (internal citations omitted). Also, "[i]n analyzing a statute, we must always be cognizant of the fundamental principle that statutory construction is approached from a 'commonsensical' perspective. Thus, we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Frost v. State*, 336 Md. 125, 137, 647 A.2d 106, 112 (1994) (citation omitted).

### Whether HG § 10-618 And CJP § 5-623 Apply To The Health Care Providers Generally

To resolve the Family's contention that § HG 10-618 does not apply to those—like the Health Care Providers—who perform an involuntary admission evaluation, we look to the words of the statute. The Family members rely upon the language in § 10-618(a) that "[a] person who applies for involuntary admission of an individual shall have the immunity from liability," arguing that because the Health Care Providers did not apply for Williams's

7

involuntary admission, they are not covered by the statutory immunity scheme. Quite simply, this argument fails because Petitioners stop short in their reading of § 10-618. They read subpart (a) and ignore the rest of the section.

Section 10-618 provides immunity to the three groups who participate in the involuntary admission process. Although the Health Care Providers would not qualify for immunity under subsection (a), the General Assembly clearly included them when drafting subsections (b) and (c). PRMC qualifies as a "facility" under § 10-618(b), as it is a "public or private clinic, hospital, or other institution that provides or purports to provide treatment or other services for individuals who have mental disorders." HG § 10-101(e)(1). Stroop and Murphy qualify as agents or employees of a facility, pursuant to § 10-618(c). In light of this statutory scheme, Plaintiffs' narrow reading is incomplete and incorrect.

The plain, unambiguous language of HG § 10-618 and CJP § 5-623 extends immunity to health care institutions and their agents who evaluate an individual as part of the involuntary admission process.

### Whether HG § 10-618 And CJP § 5-623 Apply When Evaluation Does Not Lead To Involuntary Admission

We next consider whether the General Assembly intended to provide immunity to the Health Care Providers when they evaluate patients but decide not to involuntarily admit them. In support of their narrow reading of HG § 10-618, Plaintiffs point to the titling of Part III of Subtitle 6, captioned "Involuntary Admissions," and to CJP § 5-623 because of its caption: "Admissions to mental health facilities." Thus, Plaintiffs urge us to interpret

8

these statutes as only applying when an individual is admitted. Here, Williams was evaluated but discharged.

Again we turn to the text of HG § 10-618 and CJP § 5-623, which shield institutions and their agents who "act[] in compliance with the provisions of" Subtitle 6, Part III of the Health-General Article.[5] In addition to exempting certain actors from liability, Part III also includes provisions regarding involuntary admission applications (§ 10-615), admission certificates (§ 10-616), and limitations on admission (§ 10-617). Specifically, § 10-617 states in part:

> (a) A facility or Veterans' Administration hospital may not admit the individual under Part III of this subtitle unless:
> (1) The individual has a mental disorder;
> (2) The individual needs inpatient care or treatment;
> (3) The individual presents a danger to the life or safety of the individual or of others;
> (4) The individual is unable or unwilling to be admitted voluntarily; and
> (5) There is no available, less restrictive form of intervention that is consistent with the welfare and safety of the individual.

That the General Assembly referred to all of Part III, including these restrictions on admittance, when establishing the prerequisites to qualifying for immunity, demonstrates its intent that the immunity extend beyond a decision to admit. As Judge Robert A. Zarnoch wrote for the Court of Special Appeals, "a health care provider acts in compliance with Part III when a good faith evaluation leads to commitment, but it also acts in compliance with Part III when the conclusion of a good faith evaluation is that a less restrictive form

---

[5] Part III, captioned Involuntary Admissions, comprises HG §§ 10-613–10-619.

of intervention than commitment is warranted." *Williams*, 213 Md. App. at 655, 75 A.3d at 365. Taken together, Part III's provisions reveal that HG § 10-618 must extend beyond circumstances in which an individual is involuntarily admitted. In either case, the health care provider receives immunity pursuant to § 10-618.

It is of no consequence that the statutory captions do not specifically refer to instances in which the decision is not to admit an individual. As the Court of Special Appeals recognized below, "[i]n the Code Revision process, a 'part' is an informal unit of statutory organization [and] [i]ts headings, captions, or labels are not deemed part of the law." *Williams*, 213 Md. App. at 652 n.5, 75 A.3d at 364 n.5 (citing Chapter 21 of the Acts of 1982, § 4). As a general rule,

> [t]he caption or catchline of a section or subsection that is printed in bold type, italics, or otherwise:
> (1) is intended as a mere catchword to indicate the contents of the section or subsection; and
> (2)(i) may not be considered as a title of the section or subsection.

Md. Code (2014), § 1-208 of the General Provisions Article;[6] *see also Bourgeois v. Live Entm't, Inc.*, 430 Md. 14, 36, 59 A.3d 509, 522 (2013) ("Maryland Code, Art. 1, § 18,

---

[6] Md. Code (2014), § 1-208 of the General Provisions Article was added by Chapter 94 of the Acts of 2014, § 2. The Revisor's Note indicates that it is "new language derived without substantive change from former Art. 1, § 18." That Section read:

> The captions or headlines of the several sections of this Code which are printed in bold type, and the captions or headlines of the several subsections of this Code which are printed in italics or otherwise, are intended as mere catchwords to indicate the contents of the sections and subsections. They are not to be deemed or taken as titles of the sections and subsections, or as any part thereof; and, unless expressly so provided, they shall not be so deemed or taken when any of such sections and

mak[es] captions in State statutes 'mere catchwords' and not part of the statutes themselves[.]'").

The enacting legislation for Part III includes nothing to overcome the presumption against interpreting captions as titles or inferring legislative intent from them. Indeed, the General Assembly expressly rejected the notion advanced by Plaintiffs: "AND BE IT FURTHER ENACTED, That the Revisor's Notes and catchlines contained in this Act are not law and may not be considered to have been enacted as a part of this Act." Chapter 21 of the Acts of 1982, § 4, at 1090. Ignoring the section captions, as we must, the statutory scheme to which HG § 10-618 belongs leads us to the conclusion that the immunity provision applies both when an individual is involuntarily admitted and when the decision is made not to admit him.

Cloaking health care providers in immunity both when they decide in favor of and when they decide against admittance amounts to sound public policy, consistent with the General Assembly's intent. That the General Assembly mandated a multi-step process before an individual's involuntary admission, *see* HG §§ 10-615–617, including a detailed list of admission limitations, *see* HG § 10-617, suggests legislative concern that individuals may be wrongfully admitted.[7] As explained below, this conforms to the then-evident

---

subsections, including the captions or headlines, are amended or reenacted.

Md. Code (1957, 2011 Repl. Vol.), Article 1, § 18.

[7] At the time of the immunity legislation's passage, there was evidence of over admittance and improper confinement in the State's institutions. On September 30, 1980, Attorney General Stephen Sachs testified before the Joint Oversight Committee on Deinstitutionalization that his office had recently published a report in which it "concluded

societal goal, shared by health care professionals, of discouraging excessive admittance, with its concomitant loss of liberty.

In 1969, a year before the General Assembly adopted in Senate Bill 210 much of the substance of what is now HG § 10-617, the Maryland Commission to Prepare Substantive Changes, as Necessary, in the Mental Health Laws of the State of Maryland, issued a report to Governor Marvin Mandel, in which the Commission stated:

> This is a time of great change in the laws relating to Mental Health, not just in Maryland but nationwide. In the recent past many states have substantially revised mental health laws. Other states are thoroughly reviewing their existing laws. . . . Changes are usually dictated by increased concern over the civil rights of mentally ill persons, by an increased public awareness of mental health, perhaps also by a greater public maturity, or combination of all of these factors.

*Report to the Governor*, Commission to Prepare Substantive Changes, As Necessary, in the Mental Health Laws of the State of Maryland, at ii (Jan. 27, 1969) (footnote omitted). Increased social awareness and concern for civil rights of the mentally ill continued into the early 1980s, when the immunity statute was first added to the scheme. *See Protecting the Rights of the Mentally Ill*, Harvey J. Shwed, 64 ABA J. 565 (Apr. 1978) (referring to a "rash of legislation and court decisions at the state and federal level aimed at protecting the rights of the mentally ill and ensuring adequate treatment").

---

that there were many persons improperly confined in our institutions for the mentally ill and mentally retarded." First Report of the Joint Oversight Committee on Deinstitutionalization, at 194 (Dec. 1980).

Two years before adoption of the immunity provisions at issue here, the General Assembly's newly-formed Joint Oversight Committee on Deinstitutionalization published its first report. In its words, the Committee was created

> for the purpose of conducting a review and evaluation of deinstitutionalization in the mental hygiene and mental retardation programs in the State of Maryland . . . because, while it remains the number one priority of the Department of Health and Mental Hygiene, there appears to have been little progress over the past five years towards its implementation.

First Report of the Joint Oversight Committee on Deinstitutionalization, at 1 (Dec. 1980). The Court of Special Appeals observed that the General Assembly considered "several bills aimed at protecting the rights of mentally ill individuals" in the same year it passed the immunity bill. *Williams*, 213 Md. App. at 657, 75 A.3d at 367 (citing SB 676 (1982) and HB 1429 (1982)). The intermediate appellate court also quoted the testimony of a representative of the Mental Health Association of Maryland, Inc. regarding these bills:

> In recent years, it has become increasingly clear to mental health advocates nationwide that [it] is essential to establish these rights legislatively. We recognize the increasing court involvement which has resulted in many landmark decisions addressing gross systemic abuses. However, we are concerned and convinced that the courts alone cannot provide the standards and mechanisms that assure good patient care and guarantee that rights are respected and protected. . . . We believe it is the responsibility of all mental health providers to assure the rights of mental patients.

*Id.* at 658, 75 A.3d at 367 (quoting Testimony on SB 676 and HB 1429, Mar. 9–10, 1982). Without question, the changing attitudes about mental illness drove the General Assembly

to enact legislation aimed at preventing excessive institutionalization and protecting the civil rights of patients.[8]

If the General Assembly's intention was to protect individuals from undue deprivation of liberty, it would make little sense to give health care providers an incentive to err on the side of involuntary admittance in order to receive statutory immunity and avoid liability. Instead, the statutory scheme protects the *discretion* of health care providers tasked with deciding whether to involuntarily admit an individual. As the intermediate appellate court wisely reasoned:

> Understanding the deep concern for patient rights and stringent requirements for involuntary admittance, it would lead to an absurd result if we were to interpret the immunity provision to only apply when someone is actually admitted. In one breath the statute would discourage admitting individuals before a careful evaluation, but in the next breath provide immunity only when the decision is to admit. Out of fear of liability, mental health professionals might err on the side of admittance, instead of properly exercising their discretion and following the stringent requirements before taking away someone's liberty.

---

[8] As the Supreme Court opined during this same time, "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas,* 441 U.S. 418, 425, 99 S. Ct. 1804, 1809, 60 L. Ed. 2d 323 (1979) (quoted in *Anderson v. Dep't of Health and Mental Hygiene*, 310 Md. 217, 228, 528 A.2d 904, 910 (1987)). Although cognizant of the factual and legal distinctions between an involuntary admission—as was the case here—and an involuntary commitment—as was the case in both *Addington*, *supra*, and *Anderson, supra*—we consider the two similar to the extent they both involve an individual's fundamental loss of liberty. *See Furda v. State*, 193 Md. App. 371, 997 A.2d 856 (2010) (discussing at length the distinctions and similarities between admission and commitment).

*Id.* We agree. The immunity conferred by HG § 10-618 and CJP § 5-623 protects the discretion of health care providers, which in turn safeguards the liberties of those subject to evaluation and possible involuntary admission.

## CONCLUSION

In conclusion, we hold that the immunity provided and described in HG § 10-618 and CJP § 5-623 extends to health care providers who evaluate an individual and decide in good faith not to involuntarily admit him. The plain language of the text, the General Assembly's intent, and sound public policy compel this interpretation. Accordingly, we affirm the judgment of the Court of Special Appeals.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**